**United States District Court**
**District of Connecticut**

**Keith Massimino**,
*Plaintiff*

No. 21-cv-1132

*v.*

October 27, 2021

**Matthew Benoit** and **Frank Laone**,
*Defendants.*

**Plaintiff's Opposition to Dismissal**

On a sidewalk outside a police station, two police employees detained plaintiff Keith Massimino because he was holding a video camera and a tripod. Telling him that it was against the law to record the exterior of a police station, defendants Frank Laone and Matthew Benoit demanded that Massimino identify himself. He declined, explaining that the First Amendment protected his right to videorecord from a public sidewalk. The defendants nonetheless arrested him and initiated a criminal prosecution against him for declining. They now move to dismiss the resulting First and Fourth Amendment claims against them, making a collection of merits and qualified immunity contentions. All are wrong, and so their motion must be denied.

1.     **Relevant Facts**

As alleged in the complaint and its exhibit video—which is fairly incorporated into it—the defendants' motion takes the following facts as true.

On an October evening in 2018, Mr. Massimino decided to film the exterior of the Waterbury police department, located at 255 East Main Street in that city. The police department building occupies an entire city block facing East Main Street. A public sidewalk runs along each side of the building. There are no fences, shrubs, or any other

**oral argument requested**

obstructions interfering with a person's view of the building from any of the streets or sidewalks surrounding it.

Mr. Massimino arrived at the Waterbury police department after 6 p.m., and carried with him a handheld Canon video camera, and a tripod.  He recorded two of the four sides of the police department building from the sidewalks surrounding it.

Six minutes and forty seconds after he began recording, the defendants approached Massimino and stood close to him.  Frank Laone asked him what he was filming.  Compl. Ex. 1 at 06:40.  Massimino told them that he was gathering footage for a story.  Within twenty seconds of the defendants approaching Massimino, Benoit announced "we need ID," and Laone immediately repeated "we need ID."  Compl. Ex. 1 at 07:01.  Laone asked Massimino "how do we know you're not planning on blowing up the building?," chuckling.  *Id*. at 07:20.

Massimino assured the defendants that he had no ill will, and asked why he would need to identify himself when recording on a public sidewalk.  The defendants told him that his recording was "a security issue" because he was "videotaping the police station."  Compl. Ex. 1 at 07:07.  Laone removed all doubt and told Massimino that the defendants' demand to identify himself was "a lawful order."  Compl. Ex. 1 at 07:37.

Benoit then told Massimino several times that he was "not allowed to videotape a police station," Compl. Ex. 1 at 08:10, and Laone agreed.  *Id*. at 08:21.  Massimino asked the pair to "articulate a crime I've committed," *id*. at 08:26, and Laone announced simply: "reasonable suspicion."  *Id*. at 08:28.  While standing in front of the police station's main entrance on a busy street, Laone also claimed that Massimino was "videotaping secure areas of the police station."  *Id*. at 08:36.

Laone confirmed that Massimino was not free to leave, *id.* at 08:44, and the latter again asked what crime he had committed.  Laone again told Massimino that the name of the 'crime' he was suspected of was "reasonable suspicion," *id.* at 08:47, and Benoit demanded that Massimino identify himself.  *Id.* at 08:56.  When Massimino declined, the pair arrested him and charged him with interference in contravention of Conn. Gen. Stat. § 53a-167a(a).

Mr. Massimino pleaded a three-count complaint against the defendants [ECF No. 1].  He contends that the defendants directly violated the First Amendment by stopping him from recording the exterior of the police station (Count One).[1]  He also contends that Laone and Benoit violated the Fourth Amendment by arresting him (Count Two) and initiating a criminal prosecution against him (Count Three) for his declination to identify himself.

### 2.   Massimino was detained for identification without reasonable suspicion, and was therefore free not to identify himself.

The defendants' arguments for dismissal of Counts Two and Three posit that their encounter with Massimino was consensual, that they told him that it was illegal to

---

[1] The defendants characterize Count One as a First Amendment retaliation one, Defs.' Mot. 16, but it is not.  Direct First Amendment claims like Count One allege that the defendants' actions are the immediate, direct cause of a speech or information-reception prohibition.  *See generally Greenwich Citizens Comm., Inc. v. Counties of Warren and Washington Indus. Dev. Agency*, 77 F.3d 26, 31-32 (2d Cir. 1996) (distinguishing "affirmative First Amendment claims" from First Amendment retaliation ones).  Direct First Amendment claims "do not require specific intent," because the cause and effect between the challenged government action and resulting censorship are shoulder-to-shoulder.  *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1074 (9th Cir. 2012).  First Amendment retaliation claims, by contrast, use intent to bridge a gap between cause (protected information-gathering or speech) and effect (adverse action).  Generally, the adverse action against such a plaintiff comes later in time, is levied as a punishment for the past protected act, and often would not by itself violate the First Amendment.  *See, e.g., Brandon v. Kinter*, 938 F.3d 21, 41 (2d Cir. 2019) (defendant prison employees altered plaintiff's medically necessary diet a month after he filed meal-related grievances).  By alleging First Amendment retaliation, a plaintiff alleges that cause and later effect should be considered linked together, such that the government agency has "by withdrawal of . . . privileges" placed "limitations upon the freedom of speech which *if directly attempted* would be unconstitutional."  *Speiser v. Randall*, 357 U.S. 513, 514 (1958) (emphasis added).

record the police station, that reasonable suspicion is so fact-bound as to create qualified immunity in every situation, and, that they possessed probable cause once Massimino declined to identify himself.  Each is wrong.

The facts in the complaint show that the defendants seized Massimino just thirty seconds into their encounter when they ordered him to identify himself, and that they had no reasonable suspicion to do so.  Governing law, in turn, dictates that the defendants needed reasonable suspicion, that the reasonable suspicion inquiry is not so fact-bound as to create invariable immunity, and that the Fourth Amendment prohibits the arrest and prosecution of someone who declines to identify himself when unlawfully detained.

### 2.1.   As soon as the defendants demanded identification and Laone announced that the demand was "a lawful order," Massimino was seized.

As relevant here—where there was no physical contact between the parties until the defendants arrested Massimino—a seizure at the hands of police employees happens when the police "by means of . . . show of authority, ha[ve] in some way restrained the liberty of a citizen."  *Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968).  To determine when a show of authority causes restraint, this Court asks whether, given the attendant circumstances of the situation, "a reasonable person would believe that he was not free to leave," *Salmon v. Blesser*, 802 F.3d 249, 252 (2d Cir. 2015) (internal quotations omitted), given "the threatening presence of several [police] officers," "language or tone indicating that compliance with the [police] officer was compulsory," *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990), or a "command by a police officer to a pedestrian to stop and furnish identification."  *Ozga v. Elliot*, 150 F. Supp. 3d 178,

187 (D. Conn. 2015).  *See generally Dancy v. McGinley*, 843 F.3d 93, 101 (2d Cir. 2016) (seizure began when police, standing within two feet of plaintiff, told him multiple times not to use his cellphone); *United States v. Gori*, 230 F.3d 44, 47, 49 (2d Cir. 2000) (same where police displayed their badges and announced "Everyone step out into the hallway!"); *United States v. Gomez*, 633 F.2d 999, 1002, 1004 (2d Cir. 1980) (same where police displayed their badges and yelled the word "police").

The circumstances on the sidewalk outside of the Waterbury police station on that October night would all convince a reasonable person that they could not just "go about [their] business." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (internal quotation omitted).  Two police officers in uniform approached Massimino, stood on either side of him, and began asking him questions.  They insisted, one after the other, that "we need ID."  They speculated aloud that Massimino could be engaged in worst-case criminality such as a bombing.  And then Laone flatly stated that their identification demand was "a lawful order." Compl. Ex. 1 at 07:01.  His choice of the words "lawful" and "order" would signal to a reasonable person—as it did to Massimino—that it was not possible to walk away from the two uniformed cops on either side of him making such demands.

Perhaps sensing that their characterization of the seizure as a consensual conversation defies both the facts and their probable cause contentions,[2] the defendants pivot.  They suggest that no seizure occurred prior to arrest because Massimino declined

---

[2] Paradoxically, the defendants simultaneously contend that the happenings on the sidewalk comprised a voluntary conversation that was "less than a seizure," in which they were simply "ask[ing] a few questions," *id.* 7-8 (internal quotation omitted), but was also probable cause for the interference charge, because Massimino declined to identify himself.  *Id.* 15.  It cannot be both. If, during a consensual conversation, a person declines to identify himself and "the police take additional steps . . . to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure," that is, reasonable articulable suspicion.  *I.N.S. v. Delgado*, 466 U.S. 210, 216-17 (1984).

to identify himself and thus did not yield to the cops' show of authority.  Defs.' Mot. 9.
The argument misstates governing law.

Cases dealing with failures to submit to authority during detention—including the
two cited by the defendants—all involve instances in which a person continues to move
freely after a seizure order, but later argues that he was in fact seized despite his free
movement, so as to suppress results of a later search.  *United States v. Baldwin*, 496
F.3d 215, 216, 218 (2d Cir. 2007) (although police car's overhead flashing lights were
turned on, they did not trigger a seizure, because driver pulled over "only to drive away
as the police approach[ed]"); *United States v. Swindle*, 407 F.3d 562, 564, 566 (2d Cir.
2005) (same where police "activat[ed] their . . . strobe light" but the driver "kept
driving," even though "any reasonable driver would understand a flashing police light to
be an order to pull over").  *See generally California v. Hodari D.*, 499 U.S. 621, 629
(1991) (creating failure-to-submit exception to seizure rule).

Those flight cases are irrelevant here, where Massimino's right to *move about*
was undisputedly restrained.  *Terry*, 392 U.S. at 16 ("[W]henever a police officer accosts
an individual and restrains his freedom to walk away, he has 'seized' that person.").  *See
also United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (holding that seizure occurs
when "a reasonable person would have believed that he was not free *to leave*.")
(emphasis added).  Massimino stayed put on the square foot of sidewalk where the
defendants found him while they gave him the third degree about videographing the
outside of the police station.  His movement was restrained, and so he was seized once
the defendants demanded he identify himself and proclaimed their demands to be a
"lawful order."

### 2.2. The defendants violated the Fourth Amendment by detaining Massimino to identify him without reasonable articulable suspicion of a crime.

Not only was Massimino seized, but his seizure was unconstitutional.  To lawfully seize a person in order to identify them, the police must "have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *Brown v. Texas*, 443 U.S. 47, 51 (1979).  Any objective facts must have existed before the seizure: things occurring after it begins "cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013).

Benoit and Laone face an unsurmountable burden of demonstrating that they had reasonable articulable suspicion to seize Massimino.  First, the "crime" they claim to believe he was committing does not exist, and second, their pretextual suspicions of Massamino being a bomber or shooter were unsupported by a single articulable fact leading to an objectively reasonable belief.

#### 2.2.1. It was impossible for Laone and Benoit to have had reasonable articulable suspicion of Massimino committing a crime that does not exist.

As to the first, they face a wall of legal impossibility.  The "suspicion" portion of reasonable articulable suspicion must be that of the detained person "committing, or ha[ving] committed, *a criminal offense*." *United States v. Walker*, 965 F.3d 180, 183 (2d Cir. 2020) (emphasis added).  The defendants claimed on the sidewalk that night that recording a police station is illegal.  In their motion, they add that it was illegal for Massimino to record the street-level entrance to the police "[y]outh [d]epartment through which juveniles who are protected from public

disclosure of their involvement with the criminal justice system are protected from public access." Defs.' Opp. 15.

But the defendants cite no criminal law penalizing either the recording of a building's plainly visible exterior, or, plainly visible door through which people in juvenile proceedings might pass.[3] That vacuum of law dooms their argument. As a basic principle of Fourth Amendment law, Benoit and Laone could not have had any suspicion that Mr. Massimino was breaking the law by recording the outside of the building because—then and now—no part of Connecticut's penal code forbids the activity, and they do not even suggest one *post hoc* in their briefing.[4]

Detaining Massimino because the defendants thought, or wished, that recording the exterior of a building was "not allowed" in Connecticut, Compl. Ex. 1 at 08:10, or that the state's criminal code forbade viewing the exterior street entrance to the youth department, is "a paradigmatic violation of the Fourth Amendment." *Vasquez v. Maloney*, 990 F.3d 232, 235 (2d Cir. 2021) (reversing summary judgment where police detained plaintiff simply because they thought that there was an outstanding warrant for his arrest, but did not check for one before seizing him).

Tellingly, when Massimino asked the defendants that night what crime they were detaining him for, their only response was "reasonable suspicion," period. But "reasonable suspicion" is not a crime. Police cannot detain someone on the basis of "reasonable suspicion," end of story; instead, they must have "grounds for suspecting

---

[3] Exhibit 1 to the complaint shows at 02:22 to 02:37 that Massimino recorded a street-level door labeled "Waterbury Police Department Youth Division." The letters appear to be twelve inches high and were visible from the sidewalk. No one entered or exited the door during the fifteen seconds in which he recorded it, and no signage announced that the door was for use by children who were or are accused of delinquency.

[4] There was and is, however, a statute forbidding Benoit and Laone from "interfer[ing] with any person taking a . . . video image of such peace officer . . . acting in the performance of such peace officer's duties." Conn. Gen. Stat. Ann. § 52-571j(b).

actual legal wrongdoing," *Freeman*, 735 F.3d at 103.  And an activity that is not forbidden does not provide reasonable articulable suspicion for a seizure.  *See, e.g.*, *Mglej v. Gardner*, 974 F.3d 1151, 1163 (10th Cir. 2020) (denying qualified immunity to cop who arrested plaintiff for declining to produce a physical piece of identification during seizure, where no criminal statute forbade plaintiff from declining); *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 465 (4th Cir. 2013) (no reasonable suspicion to detain a person suspected of not being in the country lawfully, because such an immigration violation is a civil infraction and not a crime); *Jones v. Clark*, 630 F.3d 677, 683 (7th Cir. 2011) (same where "[i]t is not a crime to take pictures on the street" and was not a crime for the plaintiff utility worker to be reading electrical meters on houses); *United States v. Williams*, 615 F.3d 657, 667 (6th Cir. 2010) (same where based on suspicion of loitering and "loitering is not a crime under state or local law"); *Gentry v. Sevier*, 597 F.3d 838, 846 (7th Cir. 2010) (same where based on habeas petitioner's having been "pushing a wheelbarrow" on a sidewalk, "which is not a crime"); *United States v. Henderson*, 463 F.3d 27, 46-47 (1st Cir. 2006) (same where based on car passenger's failure to wear seatbelt, and for car passengers in Massachusetts, "a seatbelt violation is not a crime."); *United States v. Ubiles*, 224 F.3d 213, 217-18 (3d Cir. 2000) (same where based on tip of firearms possession and Virgin Islands law did not criminalize firearms possession); *United States v. Irizarry*, 509 F. Supp. 2d 198, 209 (E.D.N.Y. 2007) (same where police saw defendant carrying a box cutter, because carrying one "was not a crime" under New York law).  For Benoit and Laone here, the complete absence of a statutory prohibition against recording or photographing the exterior of government buildings vitiates the possibility of their having had reasonable articulable suspicion to detain Massimino.

### 2.2.2. The defendants' wild speculation that Massimino might engage in a bombing or shooting is unsupported by articulable facts, and was unreasonable.

The Fourth Amendment requirements that applied to Benoit and Laone that evening in Waterbury are familiar, as they have been in place since *Terry* was decided in 1968. The defendants lacked reasonable articulable suspicion to detain Massimino and demand he identify himself absent "specific and articulable facts which, taken together with rational inferences from those facts, provide . . . a particularized and objective basis for suspecting legal wrongdoing." *Walker*, 965 F.3d at 186 (internal citation omitted). This Court assesses the facts and inferences objectively, without deferring to Benoit or Laone's judgment about whether facts existed or what inferences could be drawn from them. *Id.*[5]

The facts prior to the seizure were as follows: Massimino was standing on the East Main Street sidewalk near the front entrance to the police building. He had spent the prior six minutes walking on the sidewalk next to it. Massimino carried with him no bags or weapons, only a small hand-held camera with a small tripod attached to it. The defendants spoke with Massimino for just under thirty seconds, during which time he confirmed what the camera in his hand suggested—that he was gathering footage. He declined to tell them what the story was about. He denied having any ill will. He expressed his belief that his filming from the sidewalk was legal, and that as a result, he did not need to identify himself. He expressed his belief that the police station was a public building. At that point, Benoit and Laone both demanded that he produce

---

[5] Benoit and Laone never explain what objective facts or inferences could lead to the reasonable conclusion that Massimino was in the process of conducting a bombing or shooting. They merely repeat that they *thought* he could have been, or, that they *told him* they thought he could have been, and therefore, possessed reasonable articulable suspicion *ipse dixit*. *See* Defs.' Mot. 10, 15, 26.

identification.  Laone announced that the demand was "a lawful order," and the seizure began.

None of those facts, either alone or in combination, would cause an objective observer to suspect that Massimino was in the process of bombing the police station or shooting at it.  An unarmed person standing on a public sidewalk with a camera and tripod leads to the reasonable suspicion that he was taking pictures.

Benoit and Laone's formulation of reasonable suspicion—"how do we know you're not planning on blowing up the building?"—inverts what the Fourth Amendment required of them as civil servants.  Compl. Ex. 1 at 07:21.  They needed facts suggesting that Massimino was engaged in such a thing before detaining him, by identifying "a specific series of events" generating the possible conclusion that a bombing or shooting was afoot.  *Lifshitz*, 369 F.3d at 188.  Detaining him because they "*did not know if* Massimino was about to blow up the building or engage in a shooting," and arresting him for declining to allay their imagined fears, falls below the most obvious Fourth Amendment minima.  Defs.' Mot. 2 (emphasis added).

### 2.2.3. The reasonable suspicion requirement is not so fact-dependent as to render police qualifiedly immune from every illegal detention.

Having identified no facts generating reasonable articulable suspicion that Massimino was doing anything other the video- or photography, Benoit and Laone instead appeal to qualified immunity.  They claim that reasonable suspicion is so fact-bound that it is functionally impossible for public employees to have fair notice of its absence unless the court of appeals has addressed the precise same fact pattern.

Their contention twists a qualified immunity into an absolute one. If this were the case, each police employee in Connecticut could dodge the weight of governing authority by simply making up a wild suspicion about what a person is doing, and then announcing that the Second Circuit had never opined on the application of the facts at hand to that far-fetched offense.  Benoit and Laone's formulation of the law is belied by the repeated denial of qualified immunity for lack of reasonable articulable suspicion by courts within our circuit, notwithstanding the variations in facts confronting police employees.  *See Vasquez*, 990 F.3d at 243 (affirming lack of qualified immunity given that "an officer's unconfirmed hunch that an arrest warrant might possibly exist, coupled with nothing more than the officer's recognition of a suspect from prior arrests, does not constitute reasonable suspicion"); *Hartline v. Gallo*, 546 F.3d 95, 103 (2d Cir. 2008) (vacating summary judgment on the issue of qualified immunity "in the absence of indicia that this Court has found to support individualized reasonable suspicion in the past"); *Sanchez v. Bonacchi*, 799 F. App'x 60, 62 (2d Cir. 2020) (summary order) (affirming, at Rule 50 stage, denial of qualified immunity in absence of reasonable suspicion); *Sarnicola v. Westchester County*, 229 F. Supp. 2d 259, 275 (S.D.N.Y. 2002) (same on summary judgment); *Tisdale v. Hartley*, 442 F. Supp. 3d 569, 575 (W.D.N.Y. 2020) (same on motion to dismiss).

The defendants' citation to a lone Fifth Circuit qualified immunity decision does change that conclusion.  The cited decision, in relevant part, granted police employee defendants qualified immunity for seizing a man photographing a police station from a public sidewalk, *Turner v. Driver*, 848 F.3d 678, 691-2 (5th Cir. 2017), but denied qualified immunity for a separate count of arresting him on the identical facts.  *Id.* at 694-5. The latter portion of the decision is unhelpful to Benoit and Laone, of course,

because the Fifth Circuit concluded that "[t]he only potential reason . . . g[i]ve[n] Turner

for arresting him . . . is Turner's failure to identify himself," and "the police cannot arrest

an individual solely for refusing to provide identification." *Id.* at 694-95 (citing *Brown*,

443 U.S. at 52).[6]  It then denied qualified immunity for the arrest.

But as regards reasonable suspicion, the decision is extraordinarily weak and

unpersuasive.  Like Keith Massimino, Phillip Turner had been standing on the sidewalk

recording the exterior of the police station when employees approached him, seized him,

and demanded that he identify himself; he declined.  *Id.* at 683.  Although the Fifth

Circuit recited that Turner had no weapon, was not "using his hands in a threatening

way," and did not "otherwise pose[] a threat," *id.* at 694, it summarily concluded that

"filming in front of the police station" could generate sufficient suspicion "that Turner

was casing the station for an attack," citing news accounts of shootings at police stations

elsewhere in Texas two and three years prior, and even train bombings on another

continent seven years prior.  *Id.* at 692.

There is no basis on the facts pleaded here to reach a similar conclusion.

Moreover, the Second Circuit has been adamant in its rejection of generic assertions of

reasonable articulable suspicion unmoored from reason and fact.  *See, e.g.*, *Walker*, 965

F.3d at 187 (concluding no reasonable suspicion to be found in fact that defendant was

"walking within several city blocks of" a crime occurring two days earlier) (internal

quotation omitted); *Dancy*, 843 F.3d at 110 (same in "looking over one's shoulder at an

approaching police car"); *Freeman*, 735 F.3d at 101 (explaining that "the general label

---

[6] Texas has an interference statute similar to the one that Benoit and Laone arrested Massimino for violating, although the *Turner* court did not identify it or any other statute specifically when concluding that no probable cause for any offense existed.  *See* Tex. Penal Code § 38.15(a) (forbidding a person from "otherwise interfer[ing] with a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law").

'high crime area' is not a substitute for analysis of" the evidence surrounding a stop, and noting that police opinion on the subject is worthless without a "sense of the length of time over which [crime] occurred or whether the number of incidents was atypical."); *Lifshitz*, 369 F.3d at 188 ("[I]t is not enough to suspect that someone has committed a particular crime only because of a prior criminal conviction"). This Court must follow suit and reject the defendants' generalities here.

### 2.3.   Because the defendants had no reasonable suspicion to detain him, Massimino was not required to identify himself and his declination to do so could not generate probable cause.

The top of the defendants' house of cards teeters on their recitation of the elements of the interference statute they charged Massimino with, as seeming proof that they possessed probable cause to arrest and prosecute him for declining to furnish his name. Defs.' Mot. 15. But they fail to address the constitutional predicate that *Brown v. Texas* announced in 1979: without suspicion to seize someone, the police cannot punish the seized person for declining to identify themselves. 443 U.S. at 52.

"An individual approached by an officer who has no reasonable suspicion of wrongdoing may ignore the officer and go about his business," *United States v. Muhammad*, 463 F.3d 115, 123 (2d Cir. 2006). A person who exercises his Fourth Amendment right to decline to speak with the police in the absence of reasonable suspicion cannot be criminally charged for doing so. Were this Court to suggest overruling *Brown* and create the opposite rule, as defendants urge, it will birth a "truly paradoxical class of individuals": those who cannot be made to answer questions, "but who can be [charged] if they refuse" to answer questions. *Freeman*, 735 F.3d at 102. Connecticut's high court has recognized as much when construing the statute the

defendants charged Massimino with violating, Conn. Gen. Stat. § 53a-167a. It held, some eleven years prior to the events in this case, that probable cause for the offense may lie where a person declines to identify themselves, but only "in connection with a legitimate *Terry* stop." *State v. Aloi*, 911 A.2d 1086, 1097 n.22 (Conn. 2007).

So, the rule of *Brown* controls here: where police demands for identification proceed "without any specific basis for" suspicion, "the guarantees of the Fourth Amendment do not allow it." *Brown*, 443 U.S. at 52. There having been no "legitimate *Terry* stop" of Keith Massimino, there was necessarily no probable cause to arrest or prosecute him for declining to identify himself. *Aloi*, 911 A.2d at 1097 n.2.

Nor, of course, was there probable cause to believe that Massimino had committed any crime. Between the time of seizure (when they needed reasonable suspicion) and the time of arrest (when they needed probable cause), the defendants learned no additional information. Their post-seizure encounter only reprised the pre-seizure one: Massimino continued to explain that he was videorecording a public building from a public sidewalk, and the defendants continued their laughable insistence that recording the outside of a police station was "not allowed," and that the exterior of the police station is "not a public building." But the defendants' assertions mean nothing; what matters is whether, at the time they handcuffed Massimino, they possessed probable cause to do so. From seizure to arrest, they learned nothing new beyond the things they knew when then seized him, and hence developed no actual suspicion to believe that Massimino was committing a crime.

3. **Clear, decades-old precedent renders the defendants liable for violating Massimino's First Amendment right to gather information.**

As to Count One, Laone and Benoit contend only that they are qualifiedly immune from it because they did not know that the First Amendment protected Massimino's information-gathering.  However, the law has been clear on that point for decades, and, decisions across the country on nearly identical facts plainly foreshadowed a result in Massimino's favor.

   3.1. **The ability to receive publicly available information was protected by the First Amendment for half a century by the time the defendants stopped Massimino from videorecording.**

"As a general principle, the First Amendment bars the government from dictating what we see or read," *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245 (2002), as it has long been understood to protect a person's ability to receive or gather information.  *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943).  The Amendment's protections "go[] beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw," because a ban on gathering information is tantamount to one on expressing opinions based on that information.  *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978).  Thus, the "right to read or observe what [one] pleases" is fundamental, *Stanley v. Georgia*, 394 U.S. 557, 564-5, 568 (1969), and restrictions placed upon "those desiring to receive" information are as infirm as restrictions on publishers of it are.  *Martin*, 319 U.S. at 149 (striking anti-solicitation ordinance on that basis).  *See also, e.g., 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) ("The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.").

The First Amendment's protection for information reception does not vary with the source of the information. For fifty years, it has been clear that Americans may "to seek news from any source by means within the law." *Branzburg v. Hayes*, 408 U.S. 665, 681-82 (1972). The information-gathering right attaches to things already "open to the public generally," *Houchins v. KQED, Inc.*, 438 U.S. 1, 10 (1978), like the exterior of the Waterbury police department, plainly visible from the street as it is.

The right also does not vary with the identity of the person gathering the information. Those working as professional journalists have no preferential information access under the First Amendment, and so it makes no difference for First Amendment purposes whether Keith Massimino was employed as a journalist or not. *Branzburg*, 408 U.S. at 684; *Pell v. Procunier*, 417 U.S. 817, 834 (1974).

And, the right to receive information does not depend upon the method used. "[T]he basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 790 (2011) (internal quotation omitted). *Accord Superior Films v. Ohio Dep't of Educ.*, 346 U.S. 587, 589 (1954) (Douglas, J., concurring) ("[T]he First Amendment draws no distinction between the various methods of communicating ideas . . . [t]he movie, like the public speech, radio, or television is transitory—here now and gone in an instant."). So, if Massimino had put his camera down and simply stared at the exterior of the Waterbury police building, it would be equally absurd for Benoit and Laone to claim that they could have commanded him to avert his eyes. If Massimino had whipped out a small notebook (or composed an electronic note to himself on his phone) to write down his impressions of the building, the defendants would unquestionably be in the wrong to snatch the notebook or phone.

Had Massimino pulled out a sketchbook to draw a picture of the Waterbury police station, the same result would follow.

In the face of the settled First Amendment right to observe, the defendants claim that they could not have known that it was illegal for them to prevent Massimino from recording the Waterbury police building's exterior from the sidewalk.  But qualified immunity "does not require a case on point concerning the exact permutation of facts that state actors confront in order to establish a clear standard for their behavior." *Hancock v. Rensselaer County*, 882 F.3d 58, 69 (2d Cir. 2018).  This is because litigation over the most obvious instances of patently unconstitutional behavior tend not to occur, and there is no judicial need to state what is plain.  "There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances."  *K.H. v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990).  The First Amendment right to receive publicly available information has been settled for at least sixty years.  Simply because no cop in Connecticut, Vermont, or New York has been brazen enough to prevent a person from photographing the unobstructed exterior of a government building from the sidewalk does not mean that the defendants here should be rewarded for violating the Constitution.  The "the fundamental and virtually self-evident nature of the First Amendment's protections in this area," *Glik v. Cunliffe*, 655 F.3d 78, 85 (1st Cir. 2011), rendered the unlawfulness of Laone and Benoit's acts apparent the moment they committed them, *Townes v. City of New York*, 176 F.3d 138, 144 (2d Cir. 1999), and their motion must accordingly be denied.

### 3.2. Additionally, decisions from across the country clearly foreshadowed Massimino's First Amendment right for years before the defendants stopped him from recording.

In addition to decades of First Amendment decisions protecting the ability to gather information, Massimino's ability to video or photograph that which anyone passing by on East Main Street could see with their own eyes was plainly foreshadowed by detailed decisional law from around the country.  Our circuit teaches that, even in the absence of a decision from it, a right "will nonetheless be treated as clearly established if decisions by . . . other courts clearly foreshadow a particular ruling on the issue, even if those decisions come from courts in other circuits." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010); *see also Jones v. Treubig*, 963 F.3d 214, 237 n.13 (2d Cir. 2020) ("[W]e are permitted to consider this consensus of authority outside the Circuit").

The march of decisions from elsewhere had done just that well in advance of the 2018 night when the defendants shut down Massimino's recording.  By the time the defendants approached Keith Massimino on the sidewalk outside the police building, the First, Third, Fifth, Seventh, Ninth, and Eleventh Circuits had all established a broad First Amendment protection to videorecord public employees doing their jobs in public places.  *Fields v. Philadelphia*, 862 F.3d 353, 360 (3d Cir. 2017); *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017); *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 597-8 (7th Cir. 2012); *Glik*, 655 F.3d at 82-83; *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *see also Khoury v. Miami-Dade County Sch. Bd.*, 4 F.4th 1118, 1129 (11th Cir. 2021) (confirming the right to record police, yet again, and denying qualified immunity). Decisions from various districts of this Court echo the drumbeat.  *See Gerskovich v. Iocco*, 2017 WL 3236445, at *8-9 (S.D.N.Y. July 17, 2017) (holding that consensus of authority, "in this Court's view,

clearly foreshadow[s] a ruling here that citizens have a right to film police activity and that police officers are not entitled to qualified immunity if they retaliate against a citizen who exercises that right"); *Stolarik v. City of New York*, No. 15 CV. 5858, 2017 WL 4712423, at *3 (S.D.N.Y. Sept. 7, 2017) (similar for "journalists—if not all citizens"[7]); *Higginbotham v. New York City*, 105 F. Supp. 3d 369, 379 (S.D.N.Y. 2015) (holding that the First Amendment protects the right and that the subject of the recordings being police does not alter the analysis); *Channel 10 v. Gunnarson*, 337 F. Supp. 634, 637 (D. Minn. 1972) (holding that police who seized photographer's camera as he took pictures of burglary investigation from a public sidewalk violated the First Amendment, and explaining that "[s]eizure of the camera and film is at least as effective a prior restraint— if not more so—as" the injunction sought in the Pentagon Papers case).

As "decisions from . . . other circuits clearly foreshadow a particular ruling on the issue," *Horn v. Stephenson*, 11 F.4th 163, 169 (2d Cir. 2021) (internal quotation omitted), the defendants' protestation that there is no Second Circuit case on point fails to rebut the First Amendment protection for Massimino to record the plainly visible exterior of the Waterbury police station.

The defendants also misstate the weight of authority.  Although the Third Circuit did not clearly establish the ability to record public employees doing their jobs in *Kelly*, 622 F.3d at 263, *see* Defs.' Mot. 22, it later did so in *Fields*, more than a year before the defendants prohibited Massimino from recording the outside of the police station.  862 F.3d at 359 ("To record what there is the right for the eye to see or the ear to hear corroborates or lays aside subjective impressions for objective facts . . . Accordingly,

---

[7] Every court of appeals to recognize a right to record civil servants in public has followed *Branzburg* and applied the protection to everyone, not just professional journalists. *See, e.g., Glik*, 655 F.3d at 84 (holding that the right applied to a private individual, stating "[t]he First Amendment right to gather news is, as the [Supreme] Court has often noted, not one that inures solely to the benefit of the news media")

recording police activity in public falls squarely within the First Amendment right of access to information."). And, the unpublished Fourth Circuit decision cited by the defendants decided the qualified immunity question by simply declaring that no Fourth Circuit or Supreme Court decision has established the right, which is insufficient in our circuit. *Szymecki v. Houck*, 353 Fed. App'x 852, 853 (4th Cir. 2009); *see* 4th Cir. Local R. 36(a) (unpublished opinions do not "establish . . . a rule of law within th[e Fourth] Circuit" or "create[] a conflict with a decision in another circuit.").

Lastly, it does the defendants no good to claim that the ability to record a government *building* that is plainly visible to the public is any different from the ability to record government *employees* who are plainly visible. *See* Defs.' Mot. 22. The principle protecting the latter is the same protecting the former: that which the public can lawfully see with their own eyes is information that they are entitled to gather without government censorship. If Waterbury did not wish to expose the exterior of its police station to everyone walking by, it should have erected a fence on all four sides of it. Otherwise, looking at it was fair game. *Cf. United States v. $557,933.89*, 287 F.3d 66, 81 (2d Cir. 2002) (explaining that the plain view doctrine excuses necessity of a warrant for an object so long as police have "viewed the object from a lawful vantage point"). *See Fields*, 862 F.3d at 359 ("[T]o record is to see and hear more accurately."). They are not qualifiedly immune from Count One, and their motion must be denied.

4.    **Conclusion**

Because the defendants lacked reasonable articulable suspicion to detain Keith Massimino and identify him, they lacked probable cause to arrest and prosecute him for declining to identify himself.  And, because the law is clear that interrupting Massimino's videorecording violated the First Amendment, the defendants are not qualifiedly immune from liability for doing so.  Their motion to dismiss must be denied in entirety.

  /s/ Dan Barrett
Dan Barrett (# 29816)
Elana Bildner (# 30379)
ACLU Foundation of Connecticut
765 Asylum Avenue, 1st Floor
Hartford, CT 06105
(860) 471-8471
e-filings@acluct.org

*Counsel for Mr. Massimino*
