**United States District Court**
**District of Connecticut**

**Keith Massimino**,
*Plaintiff*

*v.*

**Matthew Benoit** and **Frank Laone**,
*Defendants.*

No. 21-cv-1132

June 17, 2021

**Plaintiff's Motion for Summary Judgment**

On an October evening in 2018, plaintiff Keith Massimino carried a tripod and small digital video camera with him as he walked on the sidewalks surrounding the Waterbury police station.  He videorecorded the building's exterior for about six minutes before Defendants Matthew Benoit and Frank Laone contravened the First and Fourth Amendments by seizing him, demanding that he identify himself, arresting him for declining to do so, and commencing a criminal prosecution against him for the same, all while proclaiming that it is 'illegal' to videorecord a police station.  Massimino now seeks summary judgment on all counts in his complaint.

**1.      Facts**

The scene of all the relevant action was 255 East Main Street in Waterbury, where the city's police station sits.[1]  The large brick building occupies an entire block,[2] with the front entrance facing East Main Street,[3] the two sides facing North Elm and Maple Streets,[4] and the rear of the building facing Water Street.[5]

---

[1] Pl.'s undisputed material fact # 1.
[2] *Id.* # 2.
[3] *Id.* # 3.
[4] *Id.* # 4.
[5] *Id.* # 5.  All parties agree that the map at paragraph thirteen of Massimino's complaint [ECF # 1] fairly and accurately depicts its location.  *Id.* # 6.

The police station is surrounded on all sides by sidewalks.[6]  On the evening at issue, there were no fences, shrubs, or any other obstructions interfering with a person's view of the building from any of the streets or sidewalks surrounding the police department.[7]  There were also no signs on the exterior of the police station saying that recording was prohibited.[8]

That night—October 30th—Keith Massimino was driving through Waterbury on his way home from his job as a videographer, and became stuck in traffic on Interstate 84.[9]  Massimino has an interest in First Amendment auditing, a genre of videography in which a person records in a place where it is lawful to do so in order to gauge the response, if any, of public officials.  A 'successful' audit is one in which public officials do not react to, or restrict, the videography.  He decided to wait out traffic and film the exterior of the Waterbury police department,[10] so he parked his car about a half-mile away from the station and walked toward it.[11]  He had two digital cameras and two tripods with him that day for work, and he selected the smaller camera and tripod to use while filming the police department.[12]  Massimino left the larger video camera and tripod in his car, along with his wallet,[13] and approached the police station on East Main Street.

From the time that he arrived outside the police station until he was arrested, Massimino confined his activity to the sidewalks surrounding it,[14] and not once strayed

---

[6] *Id.* # 7.
[7] *Id.* # 8.
[8] *Id.* # 9.
[9] *Id.* # 10.
[10] *Id.* # 11.
[11] *Id.* # 12.
[12] *Id.* # 13.
[13] *Id.* # 14.
[14] *Id.* # 15.

into the street or into property on which he was not allowed to tread.  He first recorded the front of the police station while walking down the East Main Street sidewalk,[15] reaching the corner of East Main and North Elm Streets after about a minute of recording.[16]  At least one surveillance camera was mounted on the exterior of the building at that corner and was visible from the sidewalk;[17] Massimino videorecorded that camera in the course of gathering footage.[18]

Turning right and walking down the sidewalk on North Elm Street, Mr. Massimino continued filming the exterior of the building.[19]  Further down North Elm where it intersects Water Street, Massimino videorecorded the police station's garage,[20] including its combined entrance and exit on North Elm.  The garage has minimal screening on its windows and a sort of gate on its entrance and exit, although the gate was open when Massimino was videorecording from the sidewalk[21] and the interior of the garage was plainly visible.  He never entered the garage.[22]

On his way down the North Elm sidewalk and back, Massimino also videorecorded the entrance to the police department's youth division.[23]  The door to the youth division of the police department is visible from North Elm Street,[24] and is marked by a sign reading "Waterbury Police Department Youth Division."[25]  At the time of the recording, the interior of the youth division was dark and nobody came or went from it.  After finishing recording on North Elm, Massimino walked back around the

---

[15] *Id.* # 16.
[16] *Id.* # 17.
[17] *Id.* # 18.
[18] *Id.* # 19.
[19] *Id.* # 20.
[20] *Id.* # 21.
[21] *Id.* # 22.
[22] *Id.* # 23.
[23] *Id.* # 24.
[24] *Id.* # 25.
[25] *Id.* # 26.

corner to the front of the police station on East Main.[26]   Every image that Massimino

recorded on the evening of October 30, 2018—including the building's front on East

Main Street,[27] the entrance to the Youth Division on North Elm Street,[28] and the garage

on North Elm Street[29]—could be readily viewed by anyone passing by, and to this day

remain available to the worldwide public on the Google Maps street view feature.

     Unbeknownst to Massimino, Defendant Matthew Benoit saw Massimino

recording on North Elm Street when Benoit happened to look outside from the police

station.[30]   Benoit told Defendant Frank Laone about Massimino,[31] and then "drove

around the building a couple of times" to see what Massimino was doing.[32]   Laone,

meanwhile, used the surveillance cameras on the police station's exterior to observe

Massimino standing on the sidewalk and videorecording.[33]

     Even though Massimino was simply strolling the sidewalk and recording what

was plainly visible to anyone else passing by, the defendants believed that Mr.

Massimino's videorecording of the police station's garage, youth division exterior door,

and exterior surveillance cameras was suspicious.[34]   But they could not articulate *what*

they suspected.   Benoit could not put his finger on any specific criminal act; he guessed

that Massimino could have been planning "anything from criminal mischief up [to] an

assault or homicide."[35]   Laone had the same inability to articulate what illegality

---

[26] *Id.* # 27.

[27] Google Maps, *255 East Main St. Waterbury, Conn.*, https://tinyurl.com/2s492z7z (last accessed June 16, 2022).

[28] Google Maps, *7 North Elm St. Waterbury, Conn.*, https://tinyurl.com/mvf26r4e (last accessed June 16, 2022).

[29] Google Maps, *19 North Elm St. Waterbury, Conn.*, https://tinyurl.com/5ettyhf4 (last accessed June 16, 2022).

[30] Pl.'s undisputed material fact # 28.

[31] *Id.* # 29.

[32] *Id.* # 30.

[33] *Id.* # 31.

[34] *Id.* # 32.

[35] *Id.* # 33.

Massimino was engaged in, speculating that "[i]t could have been a wide range of spectrum of crimes that he could have been committing."[36]

So, after Massimino had been videorecording for a grand total of six minutes and nine seconds,[37] the two defendants approached him on the East Main Street sidewalk.[38] They were both in uniform,[39] with Laone emerging from the police station and Benoit stepping out of his car.  Before speaking with Massimino, the two defendants had just one basis for being suspicious of him, which was his videorecording.[40]  When they approached him, they had no suspicion that Massimino had a weapon.[41]

The defendants stood close to Massimino, with one on either side of him.[42] Defendant Laone spoke first, asking Massimino what he was "taping."[43]  Massimino responded truthfully that he was "getting footage" and "just getting content for a story."[44]  Laone asked "what kind of story," and Massimino declined to reveal its contents, citing the fact that he was still working on it. [45]

Benoit then Massimino that "we need ID," and Laone immediately repeated "we need ID."[46]  The total time of the parties' conversation before the defendants ordered Massimino to produce ID was twenty-two seconds.[47]

Massimino asked why he would need to identify himself when he was engaged in First Amendment protected activity.[48]  Benoit claimed that Massimino presented "a

---

[36] *Id.* # 34.
[37] *Id.* # 39.
[38] *Id.* # 35.
[39] *Id.* # 36.
[40] *Id.* # 37.
[41] *Id.* # 38.
[42] *Id.* # 41.
[43] *Id.* # 40.
[44] *Id.* # 42.
[45] *Id.* # 43.
[46] *Id.* # 44.
[47] *Id.* # 45.
[48] *Id.* # 46.

security issue," because he was "videotaping a police station."[49]  Laone asked

Massimino, "how do we know you're not planning on blowing up the building?" but

seemed not to even take his own suggestion seriously, as he chuckled while asking the

question.[50]  When Massimino assured the defendants that he had no ill will, Benoit

doubled down on the defendants' inside-out version of reasonable suspicion by telling

Massimino that "we don't know that,"[51] although Benoit had no facts suggesting

otherwise.

Laone told Massimino that the defendants' earlier demand that he identify

himself was "a lawful order."[52]  The total time of the parties' conversation before the

defendants told Massimino that their identification demand was "a lawful order" was

fifty-six seconds.[53]

On the East Main Street sidewalk, Benoit told Massimino several times that he

was "not allowed to videotape a police station,"[54] but did not identify any statute

rendering it illegal do so.  Laone agreed with Benoit's assertions that it was illegal to

videorecord a police station.[55]  When Massimino asked the pair to "articulate a crime

I've committed," the situation turned darkly farcical, with Laone announcing simply

"reasonable suspicion,"[56] and claiming that Massimino was "videotaping secure areas of

the police station" by videorecording what was in plain view from the sidewalk.[57]

---

[49] *Id.* # 47.
[50] *Id.* # 48.
[51] *Id.* # 49.
[52] *Id.* # 50.
[53] *Id.* # 51.
[54] *Id.* # 52.
[55] *Id.* # 53.
[56] *Id.* # 54.
[57] *Id.* # 55.

Laone confirmed that Massimino was not free to leave,[58] and when asked again what crime Massimino had committed, once more named the offense as "reasonable suspicion."[59]

Then, Benoit again demanded that Massimino identify himself.[60] Massimino declined, and the defendants ordered him to put his hands behind his back for arrest.[61] The total time of the parties' interaction from its start to the defendants ordering Massimino to place his hands behind his back was two minutes and twenty seconds.[62]

Once Massimino was inside the police station, the defendants charged him with violating Conn. Gen. Stat. § 53a-167a,[63] which prohibits interference with the police. They admit that they did not have probable cause for any other charge.[64]

Massimino's conditions of release—also referred to interchangeably as "bail" by state law[65]—were set in the Waterbury police station twice.  The first time, Laone set Massimino's release as contingent upon payment of a $10,000 financial condition.[66] Unable to produce $10,000, Massimino was held until 10:00 p.m.,[67] when a state judicial employee known as a bail commissioner visited the police station.[68]  The bail

---

[58] *Id.* # 56.

[59] *Id.* # 57.

[60] *Id.* # 58.

[61] *Id.* # 59.

[62] *Id.* # 60.  The parties agree that the video comprising Exhibit 1 to the complaint [ECF # 1-1] is a fair and accurate depiction of the parties' interactions, and is authentic for purposes of Fed. R. Evid. 901.  *Id.* # 61.

[63] *Id.* # 62.

[64] *Id.* # 63.

[65] *See, e.g.*, Conn. R. Super. Ct. § 38-1(a) (intermixing the two terms).  The concept encompasses measures to ensure presence at future court dates, including financial conditions like a deposit amount called "bond," with or without the backing of a surety, *id.* §§ 38-3(3),(4), and non-financial conditions such as an arrestee's promise to appear, *id.* § 38-3(1), or avoiding contact with an alleged victim. *Id.* § 38-3(b)(4). Although bail does not always involve financial conditions, Connecticut police and courts commonly use "bail," "bond," and "conditions of release" interchangeably.

[66] Pl.'s undisputed material fact # 64.

[67] Pl.'s undisputed material fact # 65.

[68] The Connecticut Superior Court closes at 5PM and does not conduct night or weekend arraignments. Bail commissioners are required to "promptly conduct an interview and . . . order release of" someone held overnight who cannot pay their bond, where such release is to be on the least-restrictive condition

commissioner did away with the $10,000 condition and instead set Massimino's conditions of release as (1) appearance at all future court dates, and (2) not "commit[ting] a federal, state, or local crime" during the pendency of the case.[69]

The interference charge laid against Massimino by the defendants resulted in a criminal case being initiated in the Connecticut Superior Court.[70] Massimino retained two criminal defense lawyers.[71]  Although the superior court possessed the authority to modify the bail commissioner-imposed conditions at his initial appearance or any time thereafter, Conn. R. Super. Ct. § 38-13, it did not, [72] and so Massimino was bound by them until the criminal case ended.  His obligation to attend court was backed both by the possibility of his release being revoked, *id*. § 38-20, and by the specter of a freestanding criminal charge for failure to appear.  Conn. Gen. Stat. Ann. § 53a-173(a).

The superior court held at least eighteen hearings in the criminal case;[73] Massimino attended all but a few of them.[74]  Almost three years later, on May 15, 2021, the superior court dismissed the lone charge against Massimino and his nightmare ended.[75]

In August 2021, Massimino filed this pursuant to 42 U.S.C. § 1983.  Massimino contends that the defendants violated the First Amendment by stopping him from viewing and memorializing things in plain view from the sidewalk (Count One); the Fourth Amendment right against unreasonable seizure by detaining him for

---

necessary to secure attendance at an initial court appearance, Conn. Gen. Stat. § 54-63d(a), within fourteen days.  Conn. R. Super. Ct. § 38-6.

[69] Pl.'s undisputed material fact # 66.
[70] *Id*. # 67.
[71] *Id*. # 69.
[72] *Id*. # 68.
[73] *Id*. # 70.
[74] *Id*. # 71.
[75] *Id*. # 72.

identification, and arresting him for declining to do so (Count Two); and the Fourth

Amendment right against unreasonable seizure again by commencing a criminal

prosecution against him absent probable cause to believe that he had committed a crime

(Count Three).  Discovery proceeded apace, and the Court denied the defendants'

motion to dismiss on April 26, 2022 [ECF # 26].  With discovery now complete, the

record demonstrating that "there is no genuine dispute as to any material fact," and the

well-settled law uniformly in his favor, Massimino moves for summary judgment on all

counts.  Fed. R. Civ. P. 56(a).


**2.     Benoit and Laone's decision to stop Massimino from videorecording violated his First Amendment right to gather information and compose expression.**

The first right stamped on by the defendants on the sidewalk that evening was

Massimino's First Amendment right to view and record what was plainly visible to

anyone on the sidewalk.  Decades of case law protected both Massimino's ability to use

the media of his choice to record and his ability to gather information with which to

compose expression.  The defendants' decision to prevent him from recording the

exterior of the police station was a content-based restriction triggering their burden to

satisfy strict scrutiny.


**2.1.   The First Amendment protects the use of all media when collecting information, and treats information-gathering and composition the same as expression itself.**

"As a general principle, the First Amendment bars the government from

dictating what we see or read," *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245

(2002), as it has long been understood to protect a person's ability to receive or gather

information. *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943). The Amendment's protections "go[] beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw," because a ban on gathering information is tantamount to one on expressing opinions based on that information. *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978). Thus, the "right to read or observe what [one] pleases" is fundamental, *Stanley v. Georgia*, 394 U.S. 557, 564-5, 568 (1969), and restrictions placed upon "those desiring to receive" information are as infirm as restrictions on publishers of it are. *Martin*, 319 U.S. at 149 (striking anti-solicitation ordinance on that basis). *See also, e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) ("The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.").

Moreover, the right to receive information does not depend upon the method used to access the information. "[T]he basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (internal quotation omitted). *Accord Superior Films v. Ohio Dep't of Educ.*, 346 U.S. 587, 589 (1954) (Douglas, J., concurring) ("[T]he First Amendment draws no distinction between the various methods of communicating ideas . . . [t]he movie, like the public speech, radio, or television is transitory—here now and gone in an instant."). *Citizens United v. FEC*, 558 U.S. 310, 353-54 (2010) ("The Framers may have been unaware of certain . . . forms of communication, but that does not mean that those speakers and media are entitled to less First Amendment protection than those types . . .

that provided the means of communicating political ideas when the Bill of Rights was adopted.").

If Massimino had put down his camera and simply stared at the exterior of the Waterbury police building, it would be equally absurd for Benoit and Laone to claim that they could have commanded him to avert his eyes.  If Massimino had whipped out a small notebook (or composed an electronic note to himself on his phone) to write down his impressions of the building, the defendants would unquestionably be in the wrong to snatch the notebook or phone.  Had Massimino called a friend and described the building to them over the telephone, the same result would follow.

In addition to protecting expression itself, the First Amendment protects antecedent processes of expression—and to the same extent.  The acts and tools used to formulate and disseminate expression are within the Amendment's protections because a crafty censor could work out, for example, that a ban on musical composition—or even on composition software or paper—would have the same effect as a ban on disseminating the resulting music itself.  *See Los Angeles Police Dep't v. United Reporting Publ'g*, 528 U.S. 32, 42 (1999) (Scalia, J., concurring) (noting his view that "a restriction . . . den[ying] access to persons who wish to use the information for certain speech purposes, is in reality a restriction upon speech rather than upon access to government information.").  The Supreme Court has therefore treated speech formulation or dissemination barriers as if straightforwardly aimed at specific speech itself, and Defendants Benoit and Laone were responsible for knowing and abiding by that principle.  *See, e.g., Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017) (striking statute barring sex offenders from accessing most websites and social media, for restricting "access to what for many are the principal sources for knowing current

events . . . and otherwise exploring the vast realms of human thought and knowledge," which in turn "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard."); *Minneapolis Star & Trib. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 585 (1983) (striking tax on printing paper and ink that differentially applied to newspapers as operating to threaten critical commentary by the press); *Grosjean v. Am. Press Co.*, 297 U.S. 233, 246, 250 (1936) (striking tax on advertising revenue as "a deliberate and calculated device in the guise of a tax to limit the circulation of information," and surveying the pre-Independence struggles with what contemporary critics derided as "taxes on knowledge").

Our circuit's teachings provide an illustration of how expression is inseparable from the methods or materials used to formulate it.  In *Tunick v. Safir*, the court was presented with a First Amendment challenge to a permitting refusal.  The plaintiff wished to stage an early morning photo shoot on a Manhattan street for the production of one photo involving clothed subjects and another with nude ones.  209 F.3d 67, 69 (2d Cir. 2000).  The city denied him a street-closure permit for photographing nude subjects, but granted one for photographing the clothed subjects.  *Id.*  Tunick sued, was granted an injunction, and the parties thereupon devoted much energy to disputing the meaning of the state statute cited by New York City to deny permission for one of the photos.  The salient feature of the speech analysis for this Court, however, is the Second Circuit's treatment of *the photo shoot* as inseparable from whatever photos would result. The court of appeals made no effort to pull the two apart, but concluded that Tunick's predicament comprised an irreparable denial of his right to free expression.  *Id.* at 70. And in deciding whether to certify the state statutory question to New York's high court, the Second Circuit concluded that the permit denial presented "serious constitutional

difficulties," because the denial halted Tunick's "artistic activity," to wit, "his photography." *Id.* at 80.  The court's analysis did not isolate the photo shoot from the photos Tunick sought to eventually create, and instead worked through the law of obscenity as applied to the as-yet-created photos, using them as a stand-in for both the expression-production process, and the expression itself.  *Id.*  That our Court of Appeals thought the two so obviously inseparable is testament to how consistent First Amendment decisions on point have been: restrictions on creating a message are the same as restrictions on the message itself.

**2.2. The defendants violated the First Amendment when they forced Mr. Massimino to stop recording, because they had no compelling government interest in stopping anyone from viewing or recording the plainly visible exterior of the Waterbury police station.**

Although they loudly proclaimed on the East Main Street sidewalk that recording a police station is "illegal," both defendants admitted at deposition that they stopped Massimino's videorecording because of what he was recording.  They testified to knowing that videorecording, generally, is not prohibited by law, but that they interrupted his recording because of "what he was taping"[76]; specifically, the garage, youth division street door, and surveillance camera.  For First Amendment purposes, their decision to do so comprised a content-based restriction, that is, one applied because of the subject, "or the idea or message."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

To conform to the First Amendment, "content-based restrictions must be necessary to serve a compelling interest and must be narrowly drawn to achieve that

---

[76] Matthew Benoit Depo. Tr. [Ex. # 6] 20:19-22.  *Accord* Frank Laone Depo. Tr. [Ex. # 6] 24:11-14.

end," also known as strict scrutiny. *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 488 (2d Cir. 2007) (internal quotation omitted). Because content-based restrictions "are presumptively invalid," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), the burden of satisfying the strict scrutiny elements rests on the defender of the restriction, not the person challenging it. *E.g., Green Party of Conn. v. Garfield*, 616 F.3d 189, 208 (2d Cir. 2010). Laone and Benoit cannot meet either prong of the strict scrutiny analysis, and so are liable to Massimino on Count One of his complaint.

### 2.2.1. There is no compelling interest in forbidding the recording of a building's unobscured exterior that is plainly visible from a sidewalk, because the government has taken no steps to hide it.

The defendants cannot prove that stopping Massimino's recording was "necessary to serve a compelling interest," *Lusk*, 475 F.3d at 488 (internal quotation omitted), because it is impossible to imagine what interest was served by preventing him from memorializing what was visible for all the world to see. Although the defendants took pains at deposition to emphasize that Massimino's recording of the police garage, youth division street entrance, and corner surveillance camera was worthy of interruption, there is no dispute here that (1) each of those items was visible from the sidewalk, with nothing to block anyone's view of them, and (2) Massimino never left the sidewalk, and so, never set foot on any restricted area of the police station such as the interior of the garage. It defies the imagination to conjure any interest—let alone a compelling one—that the police may have had in preventing passersby like Massimino from recording what the police knowingly exposed to view. The defendants' belabored attempts to explain why the facades of the police department are somehow off-limits to Massimino are thoroughly debunked by the obvious: not only could (and can) anyone

walking by the building readily see everything that Massimino videotaped at any time, but anyone with internet access can instantly see the same in Google Maps. Put more bluntly, the Waterbury police department's decision not to hide the exterior features that the defendants complain were being videorecorded entirely negates any claimed governmental interest in hiding them.

Further support for this patent answer lies in decades of case law forbidding the government from punishing the revelation of information already in the public domain. In *Nebraska Press Ass'n v. Stewart*, for example, the Supreme Court vacated a state trial court order forbidding the dissemination of any testimony or evidence presented during a murder trial that was open to the public. 427 U.S. 539, 542 (1976). The court made plain that a government decision to expose information to the public negates its ability to restrict what may be done with that information. *Id.* at 568 ("[O]nce a public hearing has been held, what transpired there could not be subject to prior restraint."). *See also Cox Broad. v. Cohn*, 420 U.S. 469, 495-6 (1975) (holding that states may not impose civil liability for publication of information found in court records, and noting that "[i]f there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information" in the first place); *The Florida Star v. B.J.F.*, 491 U.S. 524, 535 (1989) ("[W]here the government has made certain information publicly available, it is highly anomalous to sanction persons other than the source of its release.").

### 2.2.2. Moreover, the narrowly tailored way to prevent anyone from recording the publicly visible features of the police station's exterior was to conceal them from view.

Although a failure to prove the existence of a compelling government interest in preventing Massimino from recording conclusively resolves Count One in Massimino's favor, the defendants fare no better if the Court examines the tailoring of the defendants' decision. Strict scrutiny's second element asks whether the challenged expressive restriction was "narrowly drawn to achieve" the end asserted by the speech-squelchers. *Lusk*, 475 F.3d at 488 (internal quotation omitted). The narrow tailoring inquiry asks whether government employees have restricted expression "only to the degree necessary to meet the particular problem at hand," *Green Party of Conn.*, 616 F.3d at 209 (internal quotation omitted), or in other words, "the least restrictive means to achieve [their] ends." *Evergreen Ass'n v. City of New York*, 740 F.3d 233, 246 (2d Cir. 2014). If a less-restrictive alternative was available to accomplish the government's goal, then the challenged restriction was *per se* unconstitutional. *E.g., Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997); *Sable Commc'ns of Cal. v. F.C.C.*, 492 U.S. 115, 126 (1989); *Landell v. Sorrell*, 382 F.3d 91, 126 (2d Cir. 2004), rev'd on other grounds, 548 U.S. 230, 236 (2006).

There was, of course, a drastically less restrictive measure available to the defendants which would have avoided any First Amendment restrictions: covering up the exterior features they objected to Massimino videorecording. If the police were concerned that the public should not see a particular exterior feature of the station, they should have put up an opaque fence, thrown a tarp over it, or planted a hedge. Doing so would have obviated any need to goaltend the public's vista from the sidewalk, and would have had the additional benefit to the defendants of being entirely consonant with

16

the First Amendment.  *E.g.*, *Houchins*, 438 U.S. at 11 (explaining that the First Amendment does not "compel[] others—private persons or governments—to supply information" not already available).  Because the defendants did not bother concealing the exterior features they claim were sensitive or private, they were not permitted to restrict Massimino's right to record them from the sidewalk.

### 2.3. It is irrelevant whether the Court deems Mr. Massimino a journalist, since journalists do not enjoy greater First Amendment access to information than do non-journalists.

No matter whether the Court views Count One as posing the question of protecting digital media or of protecting speech-formulating acts, it need not resolve whether Massimino was a journalist.  At deposition and oral argument on their motion to dismiss, the defendants interposed the question by suggesting that journalists would not have been prevented from recording the exterior of the police station, and that Massimino's lack of a press pass may have been a deciding factor in interrupting his videorecording.  According to Defendant Laone, he asked Massimino for "credentials," because in his view journalists "usually show up in some sort of marked vehicle," and if not, according to him, journalists "walk in the front desk, they have a shirt on, hey, I'm so and so with XYZ newspaper" and announce that they're going to be filming, to which Laone typically responds "Okay.  Have a good day," rather than stopping them.[77]  Benoit suggested the same, testifying that in his view, journalists "readily provide credentials, arrive in marked vehicles," and "[c]learly make it known that they're there as a member of the media."[78]  The distinction between journalists and non-journalists is immaterial

---

[77] Laone 34:17-23.
[78] Benoit 21:16-18.

here, because the appellate courts have for decades rejected the idea that journalists have a greater right to gather information than do non-journalists.

The First Amendment's protection for information reception does not vary with the occupation of the person who is seeking the information.  Since *Branzburg v. Hayes*, it has been clear that everyone may "to seek news from any source by means within the law" on equal footing, and that "[n]ewsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded."  408 U.S. 665, 681-82, 684-5 (1972).  Journalists and non-journalists alike may draw from information that is "open to the public generally," *Houchins*, 438 U.S. at 10, like the exterior of the Waterbury police department, plainly visible from the street as it is.

There is no First Amendment compulsion that government "accord the press special access to information not shared by members of the public generally," *Pell v. Procunier*, 417 U.S. 817, 834 (1974), for at least two good reasons.  First, permitting the government to determine who is—and is not—a journalist invites unconstitutionally discretionary enforcement based on a public servant's perception of the information-gatherer's purpose.  For example, Defendant Laone conceded at deposition that journalists include anyone "[who] reports news" or "stories," which "[i]n today's day and age" sweeps in "a large group of things" including "bloggers" and others,[79] yet he and his co-defendant found a reason to believe that Massimino was not one.  Attempting to discriminate between journalists and non-journalists also invites First Amendment-prohibited arbitrariness due to laypeople's misunderstanding of the different types of information-gathering.  A colloquy from Massimino's deposition encapsulates the danger:

[79] Laone 35:1-5.

Q:     [Y]ou consider yourself both a professional videographer and a photojournalist?

A.     Yes.

     . . . .

Q.     You never said [to the defendants] "I'm a videographer and photojournalist," correct?

A.     No, I never said -- I mean, it's one in the same.  I wouldn't – that's like saying I'm a carpenter but I'm also a builder.[80]

Second, splitting hairs amongst who is permitted to record the plainly visible exterior of the police station would only move the defendants out of the frying pan and into the fire. Restricting First Amendment expression on the basis of a person or entity's identity comprises speaker-based discrimination.  *Citizens United v. FEC*, 558 U.S. 310, 340-1, 352 (2010); *Minneapolis Star*, 460 U.S. at 592; *Buckley v. Valeo*, 424 U.S. 1, 19-20 (1976).  With the exterior of the police department wide open to public view, all had equal access to view, record, and speak about what was visible that October evening.

**3.    Benoit and Laone violated the Fourth Amendment when they seized Massimino based upon his videorecording, which was entirely lawful and generates no reasonable suspicion of criminality.**

In Count Two of his complaint, Keith Massimino contends that the defendants violated his Fourth Amendment right against seizure when they detained him on the sidewalk without reasonable articulable suspicion to do so.  There is no criminal statute forbidding videorecording of a police station, and the record amply demonstrates that Massimino's being "just on the corner filming"[81] gives rise to no reasonable suspicion of crime being afoot.

---

[80] Keith Massimino Depo. Tr. [Ex. # 4] 69:13-70:1.
[81] Laone 18:24.

### 3.1.   As soon as the defendants surrounded him and demanded identification, Massimino was seized.

In relevant part, Keith Massimino had the right "to be secure in [his] person[] . . . against unreasonable . . . seizures" that evening as he stood on the sidewalk. U.S. Const. amend. 4.  As happened here, where there was no physical contact between the parties until the defendants announced that Massimino was under arrest, a seizure at the hands of police employees occurs when the police "by means of . . . show of authority, ha[ve] in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968).  To determine when a show of authority causes restraint, this Court asks whether, given the attendant circumstances of the situation, "a reasonable person would believe that he was not free to leave," *Salmon v. Blesser*, 802 F.3d 249, 252 (2d Cir. 2015) (internal quotations omitted), given "the threatening presence of several [police] officers," "language or tone indicating that compliance with the [police] officer was compulsory," *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990), or a "command by a police officer to a pedestrian to stop and furnish identification." *Ozga v. Elliot*, 150 F. Supp. 3d 178, 187 (D. Conn. 2015).  *See generally Dancy v. McGinley*, 843 F.3d 93, 101 (2d Cir. 2016) (seizure began when police, standing within two feet of plaintiff, told him multiple times not to use his cellphone); *United States v. Gori*, 230 F.3d 44, 47, 49 (2d Cir. 2000) (same where police displayed their badges and announced "Everyone step out into the hallway!"); *United States v. Gomez*, 633 F.2d 999, 1002, 1004 (2d Cir. 1980) (same where police displayed their badges and yelled the word "police").

The circumstances on the sidewalk outside of the Waterbury police station on that October night would all convince a reasonable person that they could not just "go

about [their] business." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (internal quotation omitted).  Two armed police officers in uniform approached Massimino, stood on either side of him in close proximity, and began asking him questions.  They insisted, one after the other, that "we need ID."  As any reasonable person would, Massimino understood himself not to be free to leave, and he stood on the spot where he was seized.

### 3.2.   The defendants violated the Fourth Amendment by detaining Massimino to identify him without reasonable articulable suspicion of a crime.

The Fourth Amendment requirements that applied to Benoit and Laone that evening in Waterbury are familiar, as they have been in place since *Terry* was decided in 1968.  In order to seize Massimino to identify him, the defendants must have possessed "a reasonable suspicion, based on objective facts, that [he] [wa]s involved in criminal activity." *Brown v. Texas*, 443 U.S. 47, 51 (1979).  That reasonable suspicion, in turn, must have comprised "specific and articulable facts which, taken together with rational inferences from those facts, provide . . . a particularized and objective basis for suspecting legal wrongdoing." *United States v. Walker*, 965 F.3d 180, 186 (2d Cir. 2020) (internal citation omitted).  This Court assesses the facts and inferences objectively, without deferring to Benoit or Laone's judgment about whether facts existed or what inferences could be drawn from them. *Id.*  And the defendants' reasonable articulable suspicion must have existed at or before the seizure's start: occurrences after that point "cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013).  Finally, a seizure cannot be based on a person's declination to help the police or answer their questions; the police need *other* objective facts to support a seizure.

*Bostick*, 501 U.S. at 437 ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."); *accord United States v. Jordan*, No. 16-cr-93, 2017 WL 9516819, at *11 (W.D.N.Y. July 14, 2017) (no reasonable suspicion for pat-down where defendant crossed his arms in response to questioning and gave no indication of being armed).

The facts prior to the seizure were as follows: Massimino was standing on the East Main Street sidewalk near the front entrance to the police building.  He had spent the prior six minutes walking on the sidewalk next to it.  Massimino carried with him only a hand-held camera with a small tripod attached to it.  The defendants did not suspect that he was carrying any weapons.  When they approached him, they spoke with him for less than thirty seconds before each announced that "we need ID."

On those uncontested facts, Benoit and Laone face an unsurmountable burden of demonstrating that they possessed reasonable articulable suspicion to seize Massimino. First, the "crime" they claim to believe he was committing (illegal videotaping) does not exist, and second, their pretextual suspicions of Massimino being a bomber or shooter were unsupported by a single articulable fact leading to an objectively reasonable belief of such.

### 3.2.1. It was impossible for Laone and Benoit to have had reasonable articulable suspicion of Massimino committing a crime that does not exist in Connecticut law.

Reasonable articulable suspicion must support a belief that the seized person is "committing, or has committed, *a criminal offense*."  *United States v. Walker*, 965 F.3d 180, 183 (2d Cir. 2020) (emphasis added).  When they seized Mr. Massimino, the defendants emphasized that it was "illegal" to videorecord a police

station, that he was videorecording "secure areas" of the exterior of the building, and that he had committed "reasonable suspicion."  None of these comprise a criminal offense, and so could never have given rise to reasonable articulable suspicion of lawbreaking.

As a foundational principle of Fourth Amendment law, Benoit and Laone could not have had any suspicion that Massimino was breaking the law by recording the outside of the building because—then and now—no part of Connecticut's penal code forbids the activity.  Detaining Massimino because the defendants thought, or wished, that recording the exterior of a building was "not allowed" in Connecticut, Compl. Ex. 1 at 08:10, or that the state's criminal code forbade viewing the exterior street entrance to the youth department, is "a paradigmatic violation of the Fourth Amendment."  *Vasquez v. Maloney*, 990 F.3d 232, 235 (2d Cir. 2021) (reversing summary judgment where police detained plaintiff simply because they thought that there was an outstanding warrant for his arrest, but did not check for one before seizing him).

Tellingly, when Massimino asked the defendants that night what crime they were detaining him for, their only response was "reasonable suspicion," period. But "reasonable suspicion" is not a crime.  Police cannot detain someone on the basis of "reasonable suspicion," end of story; instead, they must have "grounds for suspecting actual legal wrongdoing," *Freeman*, 735 F.3d at 103.  And an activity that is not forbidden does not provide reasonable articulable suspicion for a seizure.  *See, e.g.*, *Mglej v. Gardner*, 974 F.3d 1151, 1163 (10th Cir. 2020) (denying qualified immunity to cop who arrested plaintiff for declining to produce a physical piece of identification during seizure, where no criminal statute forbade plaintiff from declining); *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 465 (4th Cir. 2013) (no reasonable

suspicion to detain a person suspected of not being in the country lawfully, because such an immigration violation is a civil infraction and not a crime); *Jones v. Clark*, 630 F.3d 677, 683 (7th Cir. 2011) (same where "[i]t is not a crime to take pictures on the street" and was not a crime for the plaintiff utility worker to be reading electrical meters on houses); *United States v. Williams*, 615 F.3d 657, 667 (6th Cir. 2010) (same where based on suspicion of loitering and "loitering is not a crime under state or local law"); *Gentry v. Sevier*, 597 F.3d 838, 846 (7th Cir. 2010) (same where based on habeas petitioner's having been "pushing a wheelbarrow" on a sidewalk, "which is not a crime"); *United States v. Henderson*, 463 F.3d 27, 46-47 (1st Cir. 2006) (same where based on car passenger's failure to wear seatbelt, and for car passengers in Massachusetts, "a seatbelt violation is not a crime."); *United States v. Ubiles*, 224 F.3d 213, 217-18 (3d Cir. 2000) (same where based on tip of firearms possession and Virgin Islands law did not criminalize firearms possession); *United States v. Irizarry*, 509 F. Supp. 2d 198, 209 (E.D.N.Y. 2007) (same where police saw defendant carrying a box cutter, because carrying one "was not a crime" under New York law).  For Benoit and Laone here, the complete absence of a statutory prohibition against recording or photographing the exterior of government buildings vitiates the possibility of their having had reasonable articulable suspicion to detain Massimino.

### 3.2.2. A person merely standing on a sidewalk filming a government building does not give rise to reasonable suspicion, and the defendants' decision to seize first and search for facts later was unconstitutional.

The picture gets no better if—instead of asking whether it is "illegal" to videorecord a police station—the Court examines whether the defendants had specific and articulable facts which, "taken together with rational inferences from those facts,

provide . . . a particularized and objective basis" for thinking that Massimino was committing any crime at all. *Walker*, 965 F.3d at 186. On this score, the defendants again come up short.

First, at deposition—with four years' hindsight—the defendants conceded that there is no crime in videorecording,[82] but attempted to recast their suspicion as lying in *what* Mr. Massimino was recording: the garage, the youth division street entrance, and the surveillance camera mounted on the corner of the building.[83] But decisional law does not deem it reasonable for the owner of things plainly visible to the public to claim that their appearance is, in fact, private. "If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Horton v. California*, 496 U.S. 128, 133 (1990). And as a corollary, it is not reasonable to suspect criminality from the act of gazing upon a street-facing building exterior in plain view, because the exposure of that exterior to the public creates the rational inference that there is no prohibition against looking at it. In fact, the Waterbury police failed to take such minimal steps such as closing the chain-link gate at the front of the garage, removing the foot-high lettering marking the youth division entrance, or disguising the surveillance camera prominently jutting from the building's corner. Their decision against hiding those features from plain view vitiates the possibility that reasonable articulable suspicion could spring from a person's gazing upon them from the sidewalk.[84]

---

[82] Benoit 20:13-14 ("Q: Isn't it legal to film a police station? A: Yes."); Laone 24:11-19 ("I would never arrest anybody for merely videotaping . . . [t]he First Amendment does protect the right to videotape.").
[83] Benoit 20:13-16; Laone 25:5-11.
[84] A vagueness problem also lurks in the defendants' formulation that looking at plain-view objects can give rise to reasonable suspicion: by simultaneously leaving the exterior features exposed to plain view *and* claiming that looking at those features creates reasonable suspicion, the defendants are reserving to themselves the discretion to selectively detain people for looking. *Cf. Papachristou v. City of Jacksonville*, 405 U.S. 156, 166 (1972) (explaining that infirm vagrancy ordinances typically avoid defining the offense, "to enable men to be caught who are vaguely undesirable in the eyes of police and prosecution, although not chargeable with any particular offense"). The identical First Amendment implications of the defendants' everyone-can-see-it-but-no-one-may-look-at-it position also render it

Second, the most unmoored version of suspicion that the defendants suggested on the Waterbury sidewalk and in their depositions—that Massimino was planning some kind of attack, and had to convince them otherwise—was just unconstitutional guessing.  On the East Main Street sidewalk that night, Laone asked Massimino "how . . . we know it's legal" to be videorecording,[85] and then simply, "how do we know you're not planning on blowing up the building?"[86]

Both defendants expounded on the theory at their depositions.  Benoit speculated that his videorecording suggested that Massimino could have been planning "anything from criminal mischief up [to] an assault or homicide."[87]  He asserted that, at the time they seized Massimino, Benoit thought Massimino could have been engaged in "anything," while admitting that "I don't know what he was up to.  That was the point of stopping him."[88]  Laone repeated the how-do-we-know theory, testifying that "I don't know if he was planning on killing somebody or trespassing.  It could have been a wide range of spectrum of crimes that he could have been committing."[89]  When asked to connect the facts of Massimino's videotaping to his speculation about the gruesome crimes he could imagine Massimino plotting, Laone conceded that "I didn't know what an exact plan would be . . . it could have been anything from damaging cruisers to blowing up the gas pump to trespassing."[90]  And when examined about his sidewalk statement that Massimino needed to demonstrate that he wasn't planning on blowing

---

untenable.  *See Cox Broadcasting*, 420 U.S. at 496 ("We are reluctant to embark on a course that would make public records generally available . . . but forbid their publication if offensive to the sensibilities of the supposed reasonable man.  Such a rule . . . would invite timidity and self-censorship.").

[85] Compl. Ex. 1 at 07:18.
[86] Compl. Ex. 1 at 07:20.
[87] Benoit 19:15-21.
[88] Benoit 30:14-17.
[89] Laone 25:20-23.
[90] Laone 37:16-22.

up the building,[91] Laone admitted that he had no reason to suspect that Massimino had

a bomb "on his person at that time," but pivoted to the endless possibilities in his

imagination: "I don't know if he was planning two, three, five, 20, 30, 50 minutes down

the road."[92]

Nothing about the facts present at the point Massimino was seized, either alone

or in combination, would cause an objective observer to suspect that Massimino was

about to commit a crime.  He was alone and unarmed on a public sidewalk, carrying

nothing but a small camera and tripod, and pointing the camera at the exterior of a

government building that faced the street openly, in daylight.  Such a person—who even

Defendant Laone described as "just on the corner filming"[93]—generates only one

reasonable conclusion: that he was taking pictures or video.  The defendants' backwards

version of reasonable suspicion resulted in the seizure of Massimino based upon an

"inchoate and unparticularized suspicion," or "a conclusion derived from intuition in the

absence of articulable, objective facts," *United States v. Singletary*, 798 F.3d 55, 60 (2d

Cir. 2015) (internal quotation omitted), better known as nothing more than a hunch.

Detaining Massimino because they had no idea "what he was up to,"[94] and could

not articulate whether Massimino's videorecording suggested anything between "killing

somebody or trespassing"[95] falls below the most obvious Fourth Amendment minima.

*See Vasquez*, 990 F.3d at 242 (detention based solely on unverified belief that there

might have been a warrant for plaintiff's arrest was based on "nothing more than

guesswork"); *United States v. Hussain*, 835 F.3d 307, 315 (2d Cir. 2016) (no suspicion

---

[91] Compl. Ex. 1 at 07:20.
[92] Laone 36:1-8.
[93] Laone 18:24.
[94] Benoit 30:14-17.
[95] Laone 25:20-23.

for protective sweep based on series of unremarkable observations, and explaining that "we are hard pressed to see how a driver in a high crime area . . . moving . . . around the center console to retrieve a smartphone can reasonably suggest that danger lurks any more than a suburban father or mother reaching for a smartphone from the center console after a traffic stop to call a spouse or relative could be considered dangerous"); *United States v. Dorlette*, 706 F. Supp. 2d 290, 303 (D. Conn. 2010) (no reasonable suspicion where police stopped the defendant "for safety purposes" after purely speculating that he might be in the street looking to fight someone); *United States v. Antuna*, 186 F. Supp. 2d 138, 144 (D. Conn. 2002) (same where police did not see "any overtly illegal activity taking place," saw "nothing in the hands" of the defendant, and thought they had once seen the defendant on a 'wanted' poster).  The complete absence of "a specific series of events" generating the rational inference that crime was afoot, *Lifshitz*, 369 F.3d at 188, rendered the defendants' seizure of Massimino unconstitutional.  Judgment must enter for him on Count Two.

**4.     The defendants committed malicious prosecution when they commenced the interference prosecution against Massimino in contravention of *Brown v. Texas*.**

The third and final count of Massimino's complaint alleges that the defendants violated his Fourth Amendment right against malicious prosecution by charging him with interference, Conn. Gen. Stat. § 53a-167a, for declining to identify himself.  Because the defendants had no reasonable articulable suspicion to detain him in the first place, the rule of *Brown v. Texas* governed: Massimino's decision not to identify himself could never have generated the probable cause necessary to prosecute him for declining.  443 U.S. at 52.

The Fourth Amendment species of malicious prosecution contests a post-arraignment seizure effected pursuant to the criminal legal process, like being released on conditions or required to come to court for subsequent hearings. *Singer v. Fulton County Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995). Judgment is appropriate for the plaintiff where he establishes a Fourth Amendment seizure plus the elements of a malicious prosecution claim under state law. *E.g., Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010). In Connecticut, there are four: the defendants (1) "initiated or procured the institution of criminal proceedings against the plaintiff" (2) terminating in the plaintiff's favor (3) without probable cause and (4) with malice. *E.g.*, *Brooks v. Sweeney*, 9 A.3d 347, 357 (Conn. 2010). Connecticut law takes the lack of probable cause as conclusively establishing malice: "[i]f the evidence supports the former, we need not consider the latter, since it may be inferred." *Zenik v. O'Brien*, 79 A.2d 769, 772 (Conn. 1951).

### 4.1.   Massimino's conditions of release were a seizure for Fourth Amendment purposes, and the defendants unquestionably commenced a criminal prosecution against him that ended in his favor.

Having been obligated by his conditions of release to attend court post-arraignment, Keith Massimino was seized for purposes of the Fourth Amendment. *E.g.*, *Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013) ("We have consistently held that a post-arraignment defendant who is obligated to appear in court in connection with criminal charges whenever his attendance is required suffers a Fourth Amendment deprivation of liberty.") (internal quotation omitted). There is similarly no dispute that the defendants initiated or procured a criminal prosecution against Massimino by

charging him with interference in contravention of Conn. Gen. Stat. § 53a-167a,[96] and, that the prosecution forever ended in his favor when the superior court granted his motion to dismiss the case. *E.g., State v. Talton*, 547 A.2d 543, 548 (Conn. 1988) ("Such a dismissal is a final judgment . . . and precludes the state from initiating another prosecution for the same offense.").

### 4.2.    Lacking a lawful basis to have seized Massimino in the first place, the defendants necessarily lacked probable cause to charge him for not answering their questions.

The final element of Count Three is the lack of probable cause.  The defendants concede that (1) the only criminal offense for which they assert they had probable cause was the interference charge they laid against Massimino, and (2) their purported probable cause for that offense was his declination to identify himself when asked.  Those facts render the Court's decision easy.

Absent reasonable articulable suspicion to seize someone, the police cannot punish the seized person for declining to identify themselves.  *Brown*, 443 U.S. at 52.  Instead, the Fourth Amendment guarantees that a person "approached by an officer who has no reasonable suspicion of wrongdoing may ignore the officer and go about his business," *United States v. Muhammad*, 463 F.3d 115, 123 (2d Cir. 2006).  The only way for the defendants to avoid judgment on Count Three is for the Court to hold that *Brown* is no longer good law, and permit police to bootstrap the declination to engage in conversation into probable cause for an interference charge.  But were the Court to do

---

[96] As described to its legislature by the state's unified prosecutorial arm, "[i]n Connecticut, unlike most jurisdictions, the police select charges after warrantless arrest and send these charges directly to the clerk's office" of the superior court, which "automatically creates the court's docket, listing the name of the accused and charges selected by the police officer."  Connecticut Div. of Crim. Justice, *The Early Screening and Intervention Program (ESI) −Report to the Joint Standing Committee on the Judiciary on PA 17-205* at 3, i (Feb. 1, 2019), *available at* https://portal.ct.gov/-/media/DCJ/PA-17-205-DCJ-Final-Report.pdf.

so, it would birth a "truly paradoxical class of individuals": those who cannot be made to answer questions, "but who can be [charged] if they refuse" to answer questions. *Freeman*, 735 F.3d at 102.

Worse for the defendants, Connecticut's supreme court expressly limited application of the interference statute at issue here in accordance with *Brown*. Eleven years prior to the events in this case, the state high court narrowed Conn. Gen. Stat. § 53a-167a to declinations of identification only "in connection with a legitimate *Terry* stop." *State v. Aloi*, 911 A.2d 1086, 1097 n.22 (Conn. 2007). Hence, as a matter of both federal and state law, Defendants Laone and Benoit could never have had probable cause to believe that Mr. Massimino's decision to stay anonymous violated Conn. Gen. Stat. § 53a-176a: both our national and state supreme courts had instructed them to the contrary years earlier.

The rule of *Brown* controls here: where police officer demands for identification proceed "without any specific basis for" suspicion, "the guarantees of the Fourth Amendment do not allow it." *Brown*, 443 U.S. at 52. There having been no "legitimate *Terry* stop" of Keith Massimino, there was necessarily no probable cause to arrest or prosecute him for declining to identify himself during that stop. *Aloi*, 911 A.2d at 1097 n.2. Judgment must enter for him on Count Three of his complaint.

**5.**     **Conclusion**

Because the defendants' interruption of Keith Massimino's videorecording fails

strict scrutiny, because they had no reasonable suspicion of crime being afoot, and

because his decision not to identify himself could never have created probable cause for

a criminal charge, judgment must enter for him on all counts.


      /s/ Dan Barrett
Dan Barrett (# 29816)
Elana Bildner (# 30379)
ACLU Foundation of Connecticut
765 Asylum Avenue, 1st Floor
Hartford, CT 06105
(860) 471-8471
e-filings@acluct.org

*Counsel for Mr. Massimino*