## United States District Court
## District of Connecticut

**Keith Massimino**,
*Plaintiff*,

No. 21-cv-1132

*v.*

July 8, 2022

**Matthew Benoit** and **Frank Laone**,
*Defendants*.

## Plaintiff's Opposition to Defendants' Motion for Summary Judgment

In 2018, Connecticut resident Keith Massimino spent a little over six minutes peaceably recording the plainly visible exterior of a police station from a public sidewalk. As a result of Defendants' unconstitutional actions, he spent the following three years waiting to get a criminal charge against him dismissed. When he finally did, he brought suit for violation of his First and Fourth Amendment rights. Now, both parties move for summary judgment.

This Court should deny Defendants' motion for summary judgment in its entirety. First, with unanimity among circuit courts, there is no question that Mr. Massimino had a clearly established right to record police activity. Second, Defendants' inside-out version of Fourth Amendment seizure law is the legal equivalent of proving a negative: Without offering a single particularized, objective fact to pin reasonable articulable suspicion on, Defendants demand that Mr. Massimino instead prove to them that he *was not* committing a crime. However: "Since *Terry*, it has been clearly established that when an officer can point to *no* facts at all to justify a hunch, the detention violates the Fourth Amendment." *Vasquez v. Maloney*, 990 F.3d 232, 240 (2d Cir. 2021) (emphasis in original). Third, and finally, without reasonable articulable

suspicion, Defendants' probable cause argument does not have a leg to stand on. Both Connecticut law and federal law have held as much for decades.

Because Defendants' arguments fail both as to the merits and as to qualified immunity, their motion should be denied.

## Facts

Mr. Massimino recounted the facts at length in his own Motion for Summary Judgment, *see* ECF No. 38, pp. 1-8, and thus briefly reprises them here.

Keith Massimino is a Connecticut resident with an interest in First Amendment auditing, a practice in which people record in places where it is lawful to do so. Plaintiff's D. Conn. Local R. 56(a)(2) Statement of Facts in Opposition to Summary Judgment ("Opp'n Stmt.") ¶¶ 7, 9. On the early evening of October 30, 2018, he was driving home from his job as a videographer when he decided to film the exterior of the Waterbury police station. *Id.* ¶¶ 8, 10, 12. That building comprises an entire city block, with the front entrance facing East Main Street, the two sides facing North Elm and Maple Streets, and the rear of the building facing Water Street. *Id.* ¶ 83. The building is surrounded by public sidewalks, and was plainly visible from them on the night in question. *Id.* ¶¶ 84-85. It did not have any signs prohibited recording, *id.* ¶ 86.

Mr. Massimino parked his car. *Id.* ¶ 16. Carrying a camera, along with his tripod, *id.* ¶ 19, he spent about six minutes walking in plain sight along the public sidewalk and videorecording the exterior of the building and any activity in front of it. *Id.* ¶ 88; *see also id.* ¶ 20. At all times, he remained on the sidewalk. *Id.* ¶ 87.

Mr. Massimino first filmed the front of the police station along East Main Street. *Id.* ¶ 19. He then turned and filmed the North Elm side of the building. *Id.* ¶ 89. Everything Mr. Massimino recorded on October 30, 2018—from the front of the

building, to the entrance to the youth division (which was dark and empty), to the entrance and exit of the garage—was plainly visible to anyone passing by on the sidewalk or street, *id.* ¶ 90.

Defendant Matthew Benoit, a Waterbury police employee who was inside the station at the time, saw Mr. Massimino recording. *Id.* ¶ 37, 38. He told his colleague, Defendant Frank Laone. *Id.* ¶ 46. Defendants found Mr. Massimino's recording suspicious, yet neither could articulate any specific criminal act they thought Mr. Massimino might be committing. *Id.* ¶ 44 (Benoit); ¶ 68 (Laone). After a little more than six minutes, they approached Mr. Massimino on the sidewalk, together, in uniform. *Id.* ¶¶ 22, 91. At the time, the defendants' sole basis for being suspicious of him was his videorecording. *Id.* ¶ 92. They did not suspect that Mr. Massimino had a weapon. *Id.* ¶ 93. Flanking him closely, they asked what he was taping. *Id.*¶ 23. Mr. Massimino responded truthfully that he was "getting footage" and "just getting content for a story." *Id.* ¶ 24. Laone asked "what kind of story," and Massimino declined to say, citing the fact that he was still working on it. *Id.* ¶ 94. At that point—22 seconds after the conversation began—both Defendants told Mr. Massimino loudly and firmly that "we need ID." *Id.* ¶¶ 95-96. They did not specify further. *Id.* ¶ 97. As he made the order, Benoit was standing within inches of Massimino, in full uniform, with his arms crossed. *Id.* ¶ 98.

When Mr. Massimino asked why he would have to identify himself if he was doing something protected by the First Amendment, *id.* ¶ 99, Benoit told him "videotaping a police station" was a "security issue." *Id.* ¶ 100. Shortly thereafter—56 seconds into the conversation—Laone stated that the demand for ID was "a lawful order." *Id.* ¶ 101. In the ensuing conversation, Defendants doubled down on their assertion that the exterior of the building was not "public" and further, that it was illegal

3

to videorecord a police station. *Id.* ¶¶ 102-04. When Mr. Massimino repeatedly asked what crime they thought he had committed, Defendants responded "reasonable suspicion." *Id.* ¶ 105.

Two minutes and twenty seconds into Defendants' conversation with Mr. Massimino, Benoit again demanded Mr. Massimino identify himself. *Id.* ¶¶ 58, 106. Defendants then proceeded to arrest him for violating Conn. Gen. Stat. § 53a-167a, which prohibits interference with the police. *Id.* ¶¶ 58, 107. They did not have probable cause for any other charge. *Id.* ¶ 108.

Although Mr. Massimino was finally able to leave the police station around 10 p.m., *id.* ¶ 109, with his conditions of release to include appearance at all future court dates, *id.* ¶ 110, it took three years and around 20 hearings in state criminal court before the charge against him was ultimately dismissed. *Id.* ¶ 111.

## Argument

### I.    Defendants Are Not Entitled to Qualified Immunity on Mr. Massimino's First Amendment Claim (Count One).

Defendants offer no substantive defense to Mr. Massimino's First Amendment claim (Count One).

Instead, Defendants resort to qualified immunity. Qualified immunity shields government officials from liability for civil damages where their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person would have been aware. *Taravella v. Town of Wolcott,* 599 F.3d 129, 133 (2d Cir. 2010). Defendants moving for summary judgment on the basis of qualified immunity must demonstrate "that no rational jury could conclude (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time

4

of the challenged conduct." *Coollick v. Hughes,* 699 F. 3d 211, 219 (2d Cir. 2012)

(quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 735 (2011)). "When considering qualified

immunity at the summary judgment stage, courts must construe all evidence and draw

all reasonable inferences in the non-moving party's favor." *Naumovski v. Norris*, 934

F.3d 200, 210 (2d Cir. 2019) (internal citation omitted). Qualified immunity is

appropriate on summary judgment only if "no rational jury could fail to conclude that it

was objectively reasonable for the defendants to believe that they were acting in a

fashion that did not violate a clearly established right." *Williams v. Greifinger*, 97 F.3d

699, 703 (2d Cir. 1996).

Defendants make no argument regarding the first prong, since they do not even

try to dispute that they violated Mr. Massimino's First Amendment rights. As for the

second prong, to establish whether a right was clearly established, courts look to the

specificity with which a right is defined, the existence of Supreme Court or Court of

Appeals case law on the subject, and the understanding of a reasonable officer in light of

preexisting law. *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014). But in our circuit,

"clearly established," for purposes of qualified immunity, "does not require a case on

point concerning the exact permutation of facts that state actors confront in order to

establish a clear standard for their behavior." *Hancock v. Cnty. of Rensselaer*, 882 F.3d

58, 69 (2d Cir. 2018). "Even if this or other circuit courts have not explicitly held a law

or course of conduct to be unconstitutional, the unconstitutionality of that law or course

of conduct will nonetheless be treated as clearly established if decisions from this or

other courts clearly foreshadow a particular ruling on the issue." *Scott v. Fischer,* 616 F.

3d 100, 105 (2d Cir. 2010) (internal citation omitted).

In this case, there can be no dispute that the public's right to record law enforcement, recognized by every single circuit court to consider it as well as numerous district courts here and elsewhere, was "clearly foreshadowed" within the meaning of *Fischer*. No reasonable police employee in Connecticut in October 2018 could have believed that citizens were barred from filming police in public—particularly in the circumstances of this case: peaceably, from a public sidewalk. Defendants' qualified immunity argument must be rejected.

### A. The Right to Record Police Is Clearly Established by Circuit Court Consensus.

On the day that Keith Massimino was detained on the sidewalk, his First Amendment right to videorecord the police was clearly established by circuit courts around the country. As of October 2018, every circuit court to consider the issue—the First, Third, Fifth, Seventh, Ninth, and Eleventh Circuits—had recognized the First Amendment right to record the police. *Glik v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011) (denying qualified immunity because citizen's right to record the police was "basic, vital and well-established"); *Fields v. City of Philadelphia*, 862 F.3d 353, 360 (3d Cir. 2017) (denying qualified immunity after finding "the First Amendment requires [police] to bear bystanders recording their actions"); *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (concluding that "First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police does exist"); *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 597-8 (7th Cir. 2012) (similar); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (similar); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (holding that "[t]he First Amendment protects the right to gather information about what public officials do on public

property, and specifically, a right to record matters of public interest"); *see also Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1129 (11th Cir. 2021) (again confirming the right, and denying qualified immunity).

To the present day, no circuit court has held to the contrary[1], and even those that have not directly weighed in have clearly signaled their agreement. *See, e.g.*, *Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020) (affirming denial of qualified immunity for observing police activity after surveying recording cases and noting that the "robust consensus of cases of persuasive authority suggests that, if the constitution protects one who records police activity, then surely it protects one who merely observes it—a necessary prerequisite to recording"). *See generally*, Jocelyn Simonson, *Beyond Body Cameras: Defending A Robust Right to Record the Police*, 104 GEO. L.J. 1559, 1561-62 (2016) (surveying federal court precedent and concluding "it is more likely than not that we are heading toward a national recognition of a First Amendment right to record on-duty police officers in public").

Even where circuit courts have not reached the issue, district courts in the Second, Fourth, Sixth, and Eighth Circuits have nonetheless recognized a First Amendment right to record the police. *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 380 (S.D.N.Y. 2015) (finding the right to record police from public areas to be "clearly established"); *Hulbert v. Pope*, 535 F. Supp. 3d 431, 450 (D. Md. 2021), *reconsideration denied*, No. CV SAG-18-00461, 2021 WL 4640668 (D. Md. Oct. 6,

---

[1] The Tenth Circuit is currently considering the issue. In that case, the United States filed an amicus brief arguing that "[a]s the other circuits to consider this issue have all recognized, the right to record law-enforcement activity is firmly rooted in well-settled First Amendment principles." Brief for the United States as Amicus Curiae, *Irizarry v. Yehia*, No. 21-1247 (Tenth Cir. Nov. 24, 2021).

2021) (holding that "the right to record police officers and other matters of public concern in a safe manner that does not interfere with the police's ability to carry out their duties was clearly established at the time of the incident"); *Dyer v. Smith*, No. 3:19-cv-921, 2021 WL 694811, at *8 n.11 (E.D. Va. Feb. 23, 2021) (declaring that, "[a]lthough neither the Supreme Court nor the Fourth Circuit has recognized a right to record government officials performing their duties, both the general constitutional rule and a consensus of cases clearly establish this right"); *Crawford v. Geiger*, 131 F. Supp. 3d 703, 715 (N.D. Ohio 2015), *aff'd*, 656 F. App'x 190 (6th Cir. 2016) (concluding that "there is a First Amendment right openly to film police officers carrying out their duties in public"); *Ahmad v. City of St. Louis, Missouri*, No. 4:17-cv-2455, 2017 WL 5478410, at *12 (E.D. Mo. Nov. 15, 2017) (recognizing that where "numerous federal circuit courts of appeals have recognized a general First Amendment right to record police performing their duties in public, subject to certain limitations . . . the Court assumes that recording police activity is considered a protected first amendment right"). *See also* Doori Song, *Qualified Immunity and the Clear, but Unclear First Amendment Right to Film Police*, 33 Notre Dame J.L. ETHICS & PUB. POL'Y 337, 342–44 (2019) ("With the exception of the Tenth Circuit, courts in every circuit have held that there is a general First Amendment right to film police activities in public, subject to reasonable time, manner, and place restrictions.").

## B. For Second Circuit Purposes, the Right to Record Police Is Clearly Foreshadowed.

The Second Circuit has recognized a right as clearly established where the decisions of other circuits form a "robust consensus of persuasive authority." *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 380 (S.D.N.Y. 2015). The

8

Second Circuit has explained that, even if the circuit has not explicitly held a governmental official's condut to be unconstitutional, "the course of conduct will nonetheless be treated as clearly established if decisions by this or other courts clearly foreshadow a particular ruling on the issue." *Scott v. Fischer,* 616 F. 3d 100, 105 (2d Cir. 2010) (quoting *Varrone v. Bilotti,* 123 F.3d 75, 79 (2d Cir. 1997)). Further, "clearly established," for purposes of qualified immunity, "does not require a case on point concerning the exact permutation of facts that state actors confront in order to establish a clear standard for their behavior." *Hancock v. Cnty. of Rensselaer*, 882 F.3d 58, 69 (2d Cir. 2018). *See also Terebesi v. Torreso*, 764 F.3d 217, 237 n.20 (2d Cir. 2014), *cert denied,* 575 U.S. 962 (2015) (holding "it is not necessary to find a case directly on point in order to show that the law governing a plaintiff's claim is clearly established"); *Weber v. Dell,* 804 F.2d 796, 801 n.6, 803–04 (2d Cir. 1986) (looking to decisions of other circuits for clearly established law).

Although the Second Circuit has not ruled directly on a First Amendment right to record the police, district courts in this circuit have joined the overwhelming national consensus in recognizing it. *See, e.g.*, *Gerskovich v. Iocco*, No. 15 Civ. 7280, 2017 WL 3236445, at *8-9 (S.D.N.Y. July 17, 2017) (holding that, "in this Court's view [the consensus of other circuits] clearly foreshadow[s] a ruling here that citizens have a right to film police activity and that police officers are not entitled to qualified immunity if they retaliate against a citizen who exercises that right"); *Stolarik v. City of New York*, No. 15-cv-5858, 2017 WL 4712423, at *3 (S.D.N.Y. Sept. 7, 2017) (recognizing the right to record as "clearly established" and "clearly foreshadowed" for "journalists—if not all citizens"); *Charles v. City of New York,* No. 12-cv-6180, 2017 WL 530460, at *24 (E.D.N.Y. Feb. 8, 2017); *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 380

(S.D.N.Y. 2015) (finding that, as of November 2011, "there was 'a robust consensus of persuasive authority' in favor of the right [to record the police] that 'clearly foreshadowed an analogous ruling' by the Second Circuit or the Supreme Court").[2]

Recognizing this consensus, police departments in major metropolises regularly train their officers that passersby may record police. *See Gerskovich*, 2017 WL 3236445 at *6 (S.D.N.Y. 2017) ("the NYPD has trained its officers since the 1970s to understand that citizens may record (photograph) police activity"); *see also Fields*, 862 F.3d at 356 (noting that the Philadelphia police department "published a memorandum advising officers not to interfere with a private citizen's recording of police activity because it was protected by the First Amendment").[3] Meanwhile, since 2015, Connecticut state law has forbidden Defendants from "interfer[ing] with any person taking a . . . video image of such peace officer . . . acting in the performance of such peace officer's duties." Conn. Gen. Stat. Ann. § 52-571j(b).

Against the backdrop of the well-settled First Amendment right to observe and to receive publicly available information, the circuit consensus, and a culture where "civilian recording of police officers is ubiquitous," *Fields*, 862 F.3d at 355, Defendants'

---

[2] Alongside the legal chorus, the general public has grown increasingly vocal about the right to record police, particularly following high-profile videos of police misconduct. *See, e.g.*, Andrea Paterson, *Yes, You Have a Right to Record the Police,* Wash. Post, Nov. 17, 2014; Anya van Wagtendonk, *How and Why You Should Record the Police,* PBS News Hour, Apr. 10, 2015 (explaining that, "broadly speaking, it is always legal to record the police in public places or when they are on-duty, so long as the witness does not interfere with police proceedings"); Kristine Guerra, *When Can You Video the Police?* Indianapolis Star, Jun. 1, 2015 (reporting that "as long as you're in public and you're not harassing anyone, you're able to film what is going on around you").

[3] Police training materials, in conjunction with precedent, can be relevant to whether the law was clearly established. *Okin v. Village of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 437 (2d Cir. 2009).

qualified immunity argument has a more basic problem: When a right is obvious, qualified immunity fails. *Simon v. City of New York*, 893 F.3d 83, 97 (2d Cir. 2018) (denying qualified immunity because of the "obvious" nature of Fourth Amendment violation). As other circuit courts vindicating the right to record police have held, the "nature of the First Amendment's protections in this area" are "virtually self-evident," *Glik*, 655 F.3d at 85, and thus provide Defendants no cover.

**C. Massimino's Recording Fell Within the Bounds of This Right.**

Keith Massimino's conduct fell within his clearly protected First Amendment right to record the police. Defendants seek to evade the unanimity of the circuits on this issue by arguing that even if clearly established, the right to film police officers and activity is somehow separable from the right to film a police *building*. But this argument is not persuasive.

First, Defendants' argument that the plainly visible exterior of a police station is somehow "private" is nonsensical. Mr. Massimino was standing on a public sidewalk and did not trespass. The entire exterior of the police department was fully visible to him, just as it was to every other person walking by (or looking at Google). Defendants appear to concede as much; in his affidavit, Laone testified that "The Waterbury Police Department is not a public building" but appears to be talking about its interior: "*Access*

to the public is not allowed without permission except in the lobby area." Laone

Affidavit, ECF No. 40-6 at ¶ 14 (emphasis added).[4]

     Second, it is paradigmatic First Amendment law that the public possesses the

right to lawfully gather information legally visible to their own eyes without

governmental interference. *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783

(1978). That Mr. Massimino filmed a building rather than a person does not alter this

fundamental principle. It would be strange to hold that the First Amendment right to

record police activity does not extend to recording the exterior of a police building from

a public sidewalk next to a busy public street, the "quintessential forum for the exercise

of First Amendment rights." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735

(2017). Underscoring this, the cases confirming the right to record police span a variety

of people, places, and even inanimate police-related objects. *See generally Glik*, 655

F.3d at 79 (filming police on Boston common); *Fields*, 862 F.3d at 356 (filming police at

protest at the Philadelphia Convention Center); *Turner*, 848 F.3d at 688 (filming

exterior of police station); *Khoury*, 4 F.4th at 1122 (filming, among other things, police

cruiser and its license plate). Whatever aspect of police activity a person is filming,

doing so equally implicates the First Amendment rights of public access to information,

---

[4] Fourth Amendment cases on reasonable expectations of privacy are instructive on this point. Because "activity a person knowingly exposes to the public is not a subject of Fourth Amendment protection," courts considering suppression motions have explicitly rejected Defendants' conflation of interior and exterior, as well as the suggestion that the plainly visible is nonetheless "private." *United States v. Parrilla*, No. 13-cr-360, 2014 WL 2111680, at *6 (S.D.N.Y. May 13, 2014), *aff'd sub nom. United States v. Kirk Tang Yuk*, 885 F.3d 57 (2d Cir. 2018) ("no support" for view that "unenclosed, accessible to public" exterior area "open to public view" "should be made equal to the enclosed inside of the business itself"); *United States v. Harry*, No. 3:21CR98, 2022 WL 343963, at *6 (D. Conn. Feb. 4, 2022) (no expectation of privacy "in activity captured by the pole camera on the street, sidewalk, and parking lot . . . because those areas were not shielded from public view").

*Branzburg v. Hayes*, 408 U.S. 665, 681-82 (1972), holding government officials accountable, *Glik,* 655 F.3d at 85, and gathering news information from all legal sources, *Houchins v. KQED*, Inc., 438 U.S. 1, 11 (1978).

Defendants' complaints notwithstanding, Mr. Massimino displayed the very behavior that other circuits have expressly approved: he stood in a public area and behaved quietly and respectfully while filming. *See, e.g.*, *Glik*, 655 F.3d at 84 (finding plaintiff's "peaceful recording . . . in a public space" fells "well within the bounds of the Constitution's protections"); *Alvarez,* 679 F.3d at 606 (holding the right to record police as "unambiguous[ly]" protected by the First Amendment where recording is "not disruptive of public order or safety, and carried out by people who have a legal right to be in a particular public location").

Defendants rely heavily on *Turner*, yet *Turner* is a mixed bag for them. The court in *Turner*—a decision issued 20 months prior to Mr. Massimino's arrest—clearly and plainly recognized filming the police as a protected First Amendment act. *Turner*, 848 F.3d at 690. Furthermore, the *Turner* court declared its intention to clearly establish such a right in the Fifth Circuit from that date (2017) forward, to prevent officers from invoking qualified immunity on the exact grounds Defendants do here. *Id.* at 687–88. Regardless, this court is not bound by the Fifth Circuit's parsing of "clearly established," but must defer to the Second Circuit's own interpretation of the term.

In sum, Defendants have not met their burden for qualified immunity. Qualified immunity does not inhere where a reasonable person in the defendants' position would be aware of the existence of the infringed constitutional right. *Coollick v. Hughes,* 699 F. 3d 211, 220 (2d Cir. 2012) (quoting *Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998)). At the time of Mr. Massimino's arrest, the public's right to peacefully record the

police in a public area was clearly established in the circuit courts (not to mention, public consciousness). Law enforcement officers are entitled to qualified immunity where they impede a constitutional right through honest error. Such protections do not, however, entitle law enforcement officers to infringe upon well-established constitutional liberties with impunity.

Because Defendants do not contest the merits of Mr. Massimino's First Amendment claim, and because they are not entitled to qualified immunity, the Court should deny Defendants' motion as to Count One.

## II.     Because They Seized Mr. Massimino Without Reasonable Articulable Suspicion, Defendants Are Not Entitled to Judgment on Mr. Massimino's Fourth Amendment Seizure Claim (Count Two).

Defendants' argument regarding Mr. Massimino's Fourth Amendment seizure seeks to turn the law on its head. Without pinpointing the time of seizure (or indeed, admitting whether a seizure occurred at all), Defendants argue that they had reasonable articulable suspicion to detain Mr. Massimino because they did not know he was not committing a crime—literally, any crime. This is simply not how the law works.

As the facts show, Defendants seized Mr. Massimino when they flanked him on both sides and, one after another, demanded his identification in no uncertain terms. Opp'n Stmt. ¶ 95. At this point, and no later, they had to have reasonable articulable suspicion for the detention. They did not. In their motion, Defendants do not offer a single, particularized, objective fact to support the assertion that Mr. Massimino was committing, or was going to commit, a crime. Instead, they offer the definition of a "inchoate and unparticularized suspicion or hunch." This is patently insufficient under *Terry*, so much so that Defendants cannot claim qualified immunity.

14

Defendants' backwards argument that they could not have known Mr. Massimino was not planning to commit any one of myriad possible offenses, and were thus authorized to seize him, distorts Fourth Amendment doctrine into something unrecognizable. This Court should not countenance it.

### A. Defendants Seized Mr. Massimino When They Flanked Him and Demanded His Identification.

Throughout their Motion, Defendants exhibit a nagging inconsistency about whether there was a seizure at all, and if so, when it occurred.

Defendants first argue that their "initial actions" did not "rise[] to the level of a seizure," but rather to the lesser threshold of "further investigation even in the absence of reasonable suspicion." Defs.' Mot. pp. 7-8. In doing so, however, they confusingly cite case law where a seizure occurred, *State v. Courchesne*, 998 A.2d 1, 25 (Conn. 2010) (we "assume, arguendo, that the police seized or detained the defendant"), and analyze their actions under the two-part *Terry* standard for deciding when seizure is warranted.

Later, however, Defendants do appear to acknowledge that Mr. Massimino was seized. *See* Defs.' Mot. p. 9 (arguing that "the detention was temporary"). But they equivocate on when the seizure occurred. They first suggest that Mr. Massimino "was not initially seized" when Defendants "approached him and inquired as to the reason for videotaping the police." *Id*. p. 8. They then do an about-face to argue that "[s]ince the Defendants had authority to perform a Terry stop, they had the authority to request identification from Massimino," *id*. p. 23, suggesting that the seizure *did* occur at that

initial juncture—i.e., even before Defendants demanded Mr. Massimino's identification.[5]

These arguments are all over the map. To be clear, there are only "[t]wo categories of seizures of the person implicating the protection of the Fourth Amendment"—seizure [] supported by probable cause (if it was an arrest) or by reasonable suspicion (if it was a *Terry* stop)." *United States v. Dorlette*, 706 F. Supp. 2d 290, 297 (D. Conn. 2010) (internal citation omitted). There was indeed a *Terry* stop in this case, and it occurred no later than the 7:01 mark in Mr. Massimino's video.

The sequence of events is as follows: At the 6:40 mark in the video, Defendants approach Mr. Massimino in uniform to ask what he is doing. Opp'n Stmt. ¶¶ 23, 101. At 7:01, flanking Mr. Massimino on both sides, Defendants firmly state in succession: "We need ID." *Id.* ¶ 95. Benoit makes this command inches from Mr. Massimino's face, his arms crossed. *Id.* ¶ 98. At this juncture, and no later, Mr. Massimino was seized. "Factors which might suggest a seizure . . . include: the threatening presence of several officers" as well as "language or tone indicating that compliance with the officer was compulsory." *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990). Once Defendants surrounded Mr. Massimino and in no uncertain terms demanded his identification, "a reasonable person would believe that he was not free to leave." *Salmon v. Blesser,* 802 F. 3d 249, 252 (2d. Cir. 2015) (internal citation omitted); *see also Florida v. Bostick*, 501

---

[5] Defendants' equivocation on whether and when seizure occurred permeates their brief. *Compare* "Plaintiff was not initially seized . . . when Benoit and Laone approached him and inquired as to the reason for videotaping," Defs.' Mot. p. 8, *with* "The Defendant officers possessed reasonable suspicion . . . to approach Massimino and inquire about his actions," *id.* p. 23 (characterizing this as "perform[ing] a *Terry* stop"). Determining when Mr. Massimino was seized for purposes of the Fourth Amendment, and whether reasonable suspicion existed at that point, is required analysis. *Dancy*, 843 F.3d at 108.

U.S. 429, 436 (1991) (framing the "show of authority" seizure inquiry as "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter").

Time and time again, the kind of scenario in which Mr. Massimino found himself at minute 7:01 of the video has been found to constitute a seizure. So much so that, as a court in this district explained in 2015, "[c]lassic examples of what I will refer to as a 'show-of-authority' seizure include an ordinary traffic stop or an obligatory command by a police officer to a pedestrian to stop and furnish identification." *Ozga v. Elliot*, 150 F. Supp. 3d 178, 187 (D. Conn. 2015). *See generally Dancy v. McGinley*, 843 F.3d 93, 108 (2d Cir. 2016) (seizure began when police, standing within two feet of plaintiff, told him "numerous times" not to use his cellphone); *United States v. Gori*, 230 F.3d 44, 47, 49 (2d Cir. 2000) (same where police displayed their badges and announced "Everyone step out into the hallway!"); *United States v. Gomez*, 633 F.2d 999, 1002, 1004 (2d Cir. 1980) (same where police displayed their badges and yelled the word "police").

## B. Defendants Were Required to Have Reasonable Articulable Suspicion at the Moment of Seizure.

It is black-letter law that a valid investigatory stop must be "justified at its inception." *United States v. Lopez,* 321 Fed. App'x 65, 67 (2d Cir. 2009) (quoting *Terry,* 392 U.S. at 20). Nonetheless, Defendants try to muddy the waters by repeatedly referencing Mr. Massimino's refusal to hand over his ID or his press credentials after they had seized him. *See, e.g.*, Defs.' Mot. pp. 9, 16. In doing so, Defendants try to conjure a world in which Mr. Massimino's reaction to their seizure somehow factors into the legality of it. This is backwards. "Any events that occur after a stop is effectuated cannot contribute to the analysis of whether there was reasonable

suspicion to warrant the stop in the first instance." *United States v. Freeman,* 735 F.3d 92, 96, 102 (2d Cir. 2013) (flatly rejecting the government's "attempt[] to delay the point of the seizure in order to include incidents that occurred after the seizure in the reasonable suspicion analysis"). Consequently, once Defendants stopped Mr. Massimino in the street, flanked him on both sides, and loudly and firmly demanded that he turn over his ID—7:01 in the video—Defendants had to have reasonable articulable suspicion to seize him. They could not develop it hours later, minutes later, or even seconds later.

It is irrelevant how Mr. Massimino responded to Defendants' demand for ID, and whether his response "heightened their suspicions." *See* Defs.' Mot. p. 9. It is irrelevant whether he told Defendants he was a journalist, or indeed, whether he told them anything at all, because all of this occurred *after* Defendants seized him. *Dancy*, 843 F.3d at 108–09 ("Because a stop must be justified at its inception, we consider only the facts known to McGinley that prompted him to give the [seizure] orders.")

As Defendants do here, the defendant officers in *Freeman* attempted to use Freeman's response to their seizure of him in order to advance their argument. (Though unlike Mr. Massimino, who responded to Defendants' questions, Mr. Freeman tried to keep walking.) The Second Circuit said no, in no uncertain terms. It cited the danger of creating a "paradoxical" class of individuals who could not be forced to cooperate with police, but could nonetheless be penalized for refusing to cooperate with police. *Freeman*, 735 F.3d at 102. The same goes here. Once Mr. Massimino was seized, Defendants could not use the seizure to create new justifications for itself. Instead, to support any assertion that the seizure was justified, they are restricted to only those facts they knew before the seizure. As shown below, these are entirely insufficient.

18

**C. When They Seized Him, Defendants Lacked Reasonable Articulable Suspicion that Mr. Massimino Was Committing or Was Going to Commit a Particular Crime.**

On p. 11 of their Motion, Defendants state: "*Terry* does not require, as the plaintiff contends[,] that the defendant officers had to have reasonable suspicion that a crime was being committed or was committed." This is incorrect. Reasonable articulable suspicion of criminal activity is *exactly* what *Terry* and its progeny require. *Terry*, 392 U.S. at 30 (holding that stop is justified "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot"); *Brown v. Texas*, 443 U.S. 47, 51 (1979) (requiring "a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity"); *Arizona v. Johnson,* 555 U.S. 323, 326 (2009) (explaining that a lawful stop occurs under *Terry* "when a police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense"); *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) ("The circumstances necessary to justify a *Terry* stop are a reasonable basis to think that the person to be detained "'is committing or has committed a criminal offense.'").

Accordingly, Defendants' entire defense to Mr. Massimino's Fourth Amendment seizure claim rises and falls on whether they had reasonable articulable suspicion to detain Mr. Massimino at minute 7:01 in the video. They did not.

**1. Defendants Cite No Objective Facts to Support Reasonable Articulable Suspicion.**

Defendants never explain what objective facts or inferences could have led to the reasonable conclusion that Massimino intended to engage in criminal activity. Instead—

without citing a single case or single, specific fact, *see* Defs.' Mot. pp. 15-16—they argue that they *subjectively* thought Massimino may have been planning to engage in some ambiguous criminal activity, based on "knowledge of prior attacks on police officers," or at least that they could not rule it out. *Id.*

But reasonable articulable suspicion is not a subjective inquiry. It is an objective one. A "reasonable suspicion" is one that has an "objective justification" based on more than a mere "inchoate and unparticularized suspicion or hunch." *United States v. Sokolow,* 490 U.S. 1, 7 (1989) (quotation marks omitted). Defendants could not detain Massimino and demand he identify himself absent "specific and articulable facts which, taken together with rational inferences from those facts, provide . . . *a particularized and objective basis* for suspecting legal wrongdoing." *United States v. Walker*, 965 F.3d 180, 186 (2d Cir. 2020) (internal citation omitted and emphasis added). "[A]n officer's subjective beliefs are irrelevant to our inquiry." *Id.* at n.2 (internal citation omitted). *See also United States v. Davis,* 111 F. Supp. 3d 323, 337 (E.D.N.Y. 2015) ("Reasonable suspicion, like probable cause, is determined objectively based on the information available to the police officers at the time of the stop and not on their subjective state of mind.").

Defendants' motion offers not a single "specific and articulable" fact that could support reasonable articulable suspicion. They say only, in the most generic way possible, that "The defendant officers had specific and articulable facts, which . . . provided a reasonable and legal basis" for the stop. They do not say precisely what those

facts are, which alone dooms their argument. *Terry*, 392 U.S. at 27.[6] Rather, they simply repeat that Mr. Massimino's behavior was "suspicious," but "[t]he government must do more than simply label a behavior as 'suspicious' to make it so." *United States v. Slocumb*, 804 F.3d 677, 684 (4th Cir. 2015) (no reasonable articulable suspicion).

"Even accepting the City's version of the facts, there is nothing in the record which indicates that the officers had any particular reason to suspect that [Massimino] was engaged in any criminal activity." *Wrighten v. New London Police Dep't*, 579 F. Supp. 2d 322, 325 (D. Conn. 2008) (denying Defendants' motion for summary judgment based on officers' detention of man sitting in his car outside store in order to demand identification). "In assessing reasonable suspicion determinations, we take into account the totality of the circumstances supporting the investigatory stop." *Dancy*, 843 F.3d at 106 (internal citation omitted). The totality of the circumstances was as follows: Mr. Massimino, holding a small camera and tripod, was walking down a public street and videorecording. Opp'n Stmt. ¶¶ 19, 20, 87-90. Nothing about his actions was furtive or evasive; Defendants made no suggestion that he "appeared nervous, attempted to

---

[6] During the stop, Defendants repeatedly told Mr. Massimino that they were detaining him because it was illegal to record a police station. Opp'n Stmt. ¶¶ 102, 103. But there cannot be reasonable articulable suspicion for a crime—recording the police station— that does not exist. Pl.'s Mot. pp. 22-24. Years later, at deposition and in the affidavits filed with their motion for summary judgment, Defendants abandon this argument, and instead attempt to say that it was the "manner" in which Mr. Massimino was filming that made them suspicious. *See, e.g.*, Benoit Affidavit, ECF No. 40-5 ¶ 10; Laone Affidavit, ECF No. 40-6 ¶ 12 (identical statements that "[t]he manner in which [Plaintiff] was videotaping was suspicious and alarming"). But they do not actually articulate anything about the "manner" of filming, or Mr. Massimino's conduct. Instead, they again default to *what* Mr. Massimino was filming: "the gas pumps, the juvenile division." *Id*. Benoit acknowledged that that there was in fact no part of the exterior of the police station that Mr. Massimino could film without making him suspicious. Benoit Deposition, ECF No. 38-6, at 23:1-5. This brings Defendants full circle: What made them suspicious was the filming of a public building, standing alone.

conceal anything, changed direction, ran away, quickened [his] pace, or made furtive gestures." *Dancy*, 843 F.3d at 110; *cf. United States v. Muhammad*, 463 F.3d 115, 123 (2d Cir. 2006) (lawful seizure after "personal observation of evasive conduct" on top of "detailed description by anonymous tipster" and location in specific high-crime area). Instead, Mr. Massimino was always in plain sight. Defendants had no reason to think he had a weapon, Opp'n Stmt. ¶ 93, and in fact, never checked for one until after the arrest. Laone Deposition, ECF No. 38-5 at 19:20-24 (no suspicion of Mr. Massimino "using deadly force"), 20:15-24 (would have patted him down if thought he had a weapon; did not do so); Benoit Deposition, ECF No. 38-6 at 17:13-18:2 (would have patted him down if thought he had a weapon; did not do so).[7] Defendants had received no information to be on the lookout for someone like Mr. Massimino, of any threats by someone like Mr. Massimino, or of any threats about anything. *Cf. United States v. Gonzalez*, No. 08 CR. 363, 2009 WL 613201, at *1 (S.D.N.Y. Mar. 4, 2009), *aff'd*, 441 F. App'x 31 (2d Cir. 2011), and *aff'd*, 470 F. App'x 2 (2d Cir. 2012) (lawful seizure after detailed tip by corroborated confidential informant). Indeed, Defendants did not even think Mr. Massimino was committing a crime—they just didn't know he *wasn't*.

That is exactly the kind of "inchoate and unparticularized suspicion or hunch" that cannot satisfy *Terry*. *Terry*, 392 U.S. at 27. When it comes to reasonable articulable

---

[7] On this point, again, Defendants attempt to turn the Fourth Amendment on its head. Neither defendant suggested he thought Mr. Massimino *had* a weapon. Rather, they suggest that they did not know he did *not* have a weapon. *See* Benoit Affidavit, ECF No. 40-5 ¶ 11; Laone Affidavit, ECF No. 40-6 ¶ 13 (identical statements that "Mr. Massimino was wearing a jacket and I was unable to determine whether he may be in possession of a concealed weapon."). Defendants have it backwards—they must point to something, not just things they were not sure they did not know. *Cf. United States v. Padilla*, 548 F.3d 179, 189 (2d Cir. 2008) (lawful seizure after, among other things, police observed recognizable gesture of adjusting concealed weapon under shirt).

suspicion, a "hunch" does not cut it. *United States v. Sokolow,* 490 U.S. 1, 7 (1989). Nor does "guesswork." *Vasquez v. Maloney*, 990 F.3d 232, 243 (2d Cir. 2021). Nor does "rank speculation." *Dorlette*, 706 F. Supp. 2d at 304. Rather, in order to detain Mr. Massimino, Defendants needed to identify "a specific series of events" generating the possible conclusion that a particular crime was afoot. *United States v. Lifshitz*, 369 F.3d 173, 188 (2d Cir. 2004) (holding that a person's having previously been convicted of a crime does not suffice for reasonable suspicion). This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Terry,* 392 U.S. at n. 18. Defendants have not met it. Accordingly, "the [g]overnment [has] failed to carry its burden of demonstrating that the actions of [Mr. Massimino] on the evening in question amounted to 'concrete factors' or 'objective indications' that he had just committed or was about to commit a criminal offense." *United States v. Castle*, 825 F.3d 625, 630 (D.C. Cir. 2016) (walking quickly and ducking into an alleyway in a neighborhood plagued by drug use insufficient for reasonable articulable suspicion).

Importantly, Defendants' generalized concern for their safety does not change the analysis. "*Terry* and its progeny do not permit a police officer to justify a stop on a concern for officer safety that is untethered to a reasonable suspicion of criminal activity." *Dorlette*, 706 F. Supp. 2d at 299. In *Dorlette,* Stamford police officers attempted to justify an investigatory stop of several men in a dark street by opining that a "fight was possible, it could happen," *id.* at 301, which the court held was an "inchoate . . . hunch that does not provide justification." *Id.* at 302 (alteration in original). The defendant officers then "repeatedly referred to their concern for officer safety," *id.* at 300, but again, the court concluded:

The officers' concern for their safety, however, was unaccompanied by any articulable facts, or inferences drawn from them, that could give rise to a reasonable suspicion that Dorlette was, or was about to be, engaged in criminal activity. Nor do they assert or provide grounds to conclude that their safety concern was tethered to a reasonable suspicion that criminal activity was afoot. Indeed, aside from Edson's rank speculation that the men had obtained weapons from the Diaz Street apartment and were going out to search for a fight, criminal activity was not a concept that the officers' testimony suggests in any way drove their stopping Dorlette. Lacking reasonable suspicion to believe that criminal activity was afoot, the officers violated the Fourth Amendment when they stopped Dorlette.

*Id.* at 304. *See also State v. Edmonds*, 145 A.3d 861, 885 (Conn. 2016) (holding that "mere conclusory testimony that the officers were concerned for their safety does not constitute the sort of specific, articulable evidence necessary to justify a *Terry* stop").[8] Defendants' appeals to officer safety, standing alone, do not check the box for reasonable articulable suspicion.

Finally, it is unclear why Defendants' post hoc justifications for their seizure fixate on certain things Mr. Massimino filmed. Over and over, Defendants note that Mr. Massimino filmed the police station's garage area, surveillance cameras on the roof, and the "Youth Division where juvenile offenders are processed after arrest." Defs.' Mot. p. 15.[9] These arguments are a red herring, and do not move the needle on the reasonable articulable suspicion analysis. First, they have nothing to do with Defendants' actual words or actions on that day—when Defendants flatly and wrongly told Mr. Massimino

---

[8] While the Connecticut constitution at times takes a broader view of seizures than the federal one, the *Edmonds* court noted that its analysis of whether reasonable suspicion was present would be the same under both. *Edmonds*, 145 A.3d at 865 n.3.

[9] It is a tautology to say that Mr. Massimino was filming these areas. By filming the exterior of the police station from the public sidewalk, his recording naturally included anything on or in front of the exterior (garage entrance, youth division, security cameras—as well as windows, railings, bushes, flagpoles, and everything else). Saying he filmed the youth division is as meaningful (and suspicion-inducing) as saying he filmed the building's bricks; of course he did.

that he was not allowed to record the police station, period, and made no effort to single out specific areas as particularly sensitive. Second, the suggestion that certain parts of the building's exterior are especially "private" is undermined by the fact that literally everything Mr. Massimino filmed—including the building's front on East Main Street, the entrance to the Youth Division on North Elm Street, and the garage on North Elm Street—is viewable to anyone passing by on the sidewalk or road, and to this day remains viewable to any person, anywhere, using Google Maps street view. Third, and most importantly, it is not clear what Defendants believe the significance of this argument to be. Were Mr. Massimino to film only the North Elm Street walls of the building, and then pointedly turn his camera off before he reached the garage entrance, would his filming be unobjectionable? In fact, Defendants' answer to this at deposition was "no": Upon questioning, Benoit stated that there was no part of the building's exterior Mr. Massimino could film that would not make him suspicious. Benoit Deposition, ECF No. 38-6, at 22:5-23:5. Thus, whether Mr. Massimino was filming the exterior of the juvenile division or a bush or a railing is beside the point; it does not get Defendants anywhere in terms of reasonable articulable suspicion.

### 2.  The Cases Defendants Cite Do Not Support Their Argument.

As with their First Amendment argument, Defendants cite *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017). As noted *supra*, the case undermines many of their arguments. And when it comes to the reasonableness of seizing someone for filming police, standing alone, Mr. Massimino respectfully submits that the Fifth Circuit's analysis is far from robust.

Summarily deciding that filming police from a public sidewalk is inherently suspicious—as the Fifth Circuit did—flies in the face of our reality, where 'civilian

recording of police officers is ubiquitous.'" *Fields v. City of Philadelphia*, 862 F.3d 353, 355 (3d Cir. 2017) (quoting Jocelyn Simonson, *Copwatching*, 104 CAL. L. REV. 391, 408 (2016)). As the Third Circuit explained in *Fields*, while filming the police may have been rare when the Rodney King video shook the country in 1991, by 2017, "the recording of police activity is a widespread, common practice" and one "of great importance." *Id.* at 357. In today's world, recording police is a routine exercise of free speech in America. *See Glik*, 655 F.3d at 84 ("The proliferation of electronic devices with video-recording capability means that many of our images of current events come from bystanders with a ready cell phone or digital camera," and thus officers must exercise restraint "when they are merely the subject of videotaping that memorializes, without impairing, their work in public spaces"); *Gaymon v. Borough of Collingdale*, 150 F. Supp. 3d 457, 468 n.9 (E.D. Pa. 2015) (noting that public filming of police "has become a regular feature of our public life and the underpinning of effective demands for redress") (internal citation omitted). In these smartphone-saturated times, suggesting, as the *Turner* court blithely did, that anyone with an iPhone or video camera might be casing a building and is thus detainable goes against "commonsense judgments and inferences about human behavior." *United States v. Singletary*, 798 F. 3d 55, 60 (2d Cir. 2016). It would also make a mockery of constitutional protections, since people would have a First Amendment right to record police but be simultaneously seizeable for doing so. Accordingly, this Court should not follow *Turner*'s logic.

In addition, the Fifth Circuit was reviewing grants of qualified immunity for Turner's detention—but, paradoxically, not his arrest—at the motion to dismiss stage. It found, in summarily affirming qualified immunity for the seizure, that the defendants could have reason to be suspicious of Turner's filming of a Texas police station,

particularly given recent attacks on other Texas police stations several months earlier. *Turner*, 848 F.3d at 692. Here, Defendants have had the benefit of months of discovery, and the ability to put on any evidence they wish. Tellingly, they have offered zero objective, particularized facts that would support reasonable articulable suspicion to seize Mr. Massimino—no tips, no threats, no furtive actions, no specific behavior of any kind other than, again, the mere recording of a police station from a public sidewalk. The Second Circuit requires far more than Defendants' generalized assumptions.

Defendants' remaining case citations are also to no avail. To conduct a *Terry* stop, Defendants "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry,* 392 U.S. at 21. If anything, the cases Defendants cite—*Gonzalez, Padilla, Singletary*, and *Terry* itself—illustrate what it takes for police to have reasonable articulable suspicion to believe that an individual is about to commit a crime, and how far the present circumstances are from that scenario.

In *Gonzalez*, for example, police had a "corroborated" tip from a regular confidential informant that several people "were going to rob an electronics store located at 20 Bruckner Boulevard in the Bronx, New York on the evening of March 25, 2008, shortly before the store closed; that the robbers would be armed with guns; and that they would arrive in a dark-colored car." *United States v. Gonzalez*, No. 08 CR. 363, 2009 WL 613201, at *1 (S.D.N.Y. Mar. 4, 2009), *aff'd,* 441 F. App'x 31 (2d Cir. 2011), and *aff'd*, 470 F. App'x 2 (2d Cir. 2012). In fact, that is exactly what happened: On that evening, several officers stationed themselves in front of the electronics store at the appointed time only to see a dark gray car with multiple occupants drive slowly past the store and park on the opposite side of the street. One of the car's occupants, Gonzalez,

then walked to and from the store, "looking all around him," before getting back in the car. *Id*. After the car moved and re-parked, Gonzalez did it a second time. *Id*. He then saw the police, and "upon looking into Detective Badyna's car and making eye contact with Detective Badyna, Gonzalez immediately turned and walked away from both Media Plaza and the Accord." *Id*. at *5. At that point, the officers realized he was wearing latex gloves, common for robbery, and quickly moved to apprehend him.

Against this backdrop, the district court made a straightforward finding that officers could indeed have reasonable articulable suspicion that Gonzalez and his friends were about to commit a specific crime—robbery of the electronics store. 2009 WL 613201, at *5. Yet the facts of *Gonzalez* could not be further from those here. The defendants in that case had an incredibly specific and corroborated tip about a potential robbery that materialized in front of their eyes, down to the last detail. By the time they saw Gonzalez walking around the sidewalk, they were operating on far more than an "inchoate and unparticularized suspicion or hunch," but were instead on the firm ground of "a particularized and objective basis for suspecting legal wrongdoing." *Walker*, 965 F.3d at 186. Here, by contrast, Defendants had no confidential informant, no tip, no threat, no information, and no context. All they saw was a man walking around in broad daylight and obviously videotaping the exterior of a building. And unlike the defendants in *Gonzalez*, who could tell the court exactly what crime they suspected—robbery of the electronics store—Defendants have never been able to articulate any particular criminal act, first telling Mr. Massimino that they had reasonable articulable suspicion of "reasonable suspicion," Opp'n Stmt. ¶ 105, and ultimately guessing that Mr. Massimino could have been planning "anything from criminal mischief up [to] an assault or homicide." Opp'n Stmt. ¶¶ 44, 68.

*Padilla*, similarly, has little to do with the facts at hand. In that case, the defendants observed two men following another man single file on a dark wooded path, after which one of the men adjusted a concealed gun in his shirt in a manner one of the defendants recognized from "eight to ten arrests of armed individuals observed to make the same movement," as well as his and his colleagues' own, frequent, conduct. *United States v. Padilla*, 548 F.3d 179, 189 (2d Cir. 2008). That gesture was not, to his knowledge, consistent with any innocent explanation. *Id*. In affirming a jury conviction and denial of a motion to suppress, the Second Circuit held that the "totality of the circumstances in this case—the high-crime neighborhood, the sight of two men surreptitiously following a man whose appearance suggested drug use down an otherwise-deserted street, the choice of a dark path not commonly used at night, the apparent adjustment of a concealed firearm—provided ample basis for an investigative stop." *Id*. Once again, this case is of no help to Defendants, who proffer only their observation of a person videotaping a public building in full view, and cannot articulate anything more than a hunch, nor even pin down what crime they thought was afoot.

*Singletary* and *Manuel*, which both involve open-container violations, are similarly straightforward—and inapposite to the present context. In *Singletary*, the plaintiff was walking down the public street holding an object the size and shape of a beer can, in a brown paper bag, "very steadily, as if to avoid spilling its contents." *United States v. Singletary*, 798 F.3d 55, 58 (2d Cir. 2015). The Second Circuit concluded that this "trio of 'specific and articulable facts' just discussed, when 'taken together with rational inferences' drawn therefrom, provided the detaining officers with a sufficient particularized and objective basis to suspect that criminal activity—in the form of an open-container violation—was afoot." *Id*. (citing *Terry*, 392 U.S. at 21, 30). It reached a

similar conclusion, with similar reasoning, in *United States v. Manuel*. 647 F. App'x 11, 12 (2d Cir. 2016) (finding that intoxicated-looking person slouched over in back of cab drinking from open cup could reasonably be thought to be violating the city's open-container law). These kinds of cases do not have much bearing on the present one. The straightforward analysis of seeing someone carrying what looks like an open container and concluding that they might be violating an open-container law is light years away from Defendants' wide-ranging speculation about all possible variety of crimes they did not know Mr. Massimino did not plan to commit, despite not seeing evidence of any.

And finally, *Terry* does not help, either. In *Terry*, the defendant officer "had been assigned to patrol this vicinity of downtown Cleveland for shoplifters and pickpockets for 30 years." *Terry v. Ohio*, 392 U.S. 1, 5 (1968). On an October afternoon in 1963, he watched Terry and a friend make an unusual, repeated "series of motions," "pacing, peering, and conferring" in a very specific way: "strolling down Huron Road, looking in the same [store] window, walking on a short distance, turning back, peering in the store window again, and returning to confer with the first man at the corner." *Id*. at 6. Notably: "The two men repeated this ritual alternately between five and six times apiece—in all, roughly a dozen trips." *Id*. With these facts in mind, the Supreme Court concluded that "the actions of Terry and Chilton were consistent with McFadden's hypothesis that these men were contemplating a daylight robbery—which, it is reasonable to assume, would be likely to involve the use of weapons—and nothing in their conduct from the time he first noticed them until the time he confronted them and identified himself as a police officer gave him sufficient reason to negate that hypothesis." *Id*. at 28.

All of these cases have much in common with each other, and little in common with this one. In each of them, the defendant officers could point to a particularized and objective basis for suspecting legal wrongdoing. In other words, they had reasons to suspect a particular crime or crimes—reasons they could readily articulate, reasons grounded in fact, reasons that were objective (a confidential informant's corroborated tip; adjustment of a concealed weapon, the well-known shape of a beer bottle). Defendants here have the opposite: "a conclusion derived from intuition in the absence of articulable, objective facts." *Singletary*, 798 F.3d at 60. That is not enough for the Fourth Amendment. *Id.* Defendants' motion for summary judgment on Count Two should be denied.

### D. Defendants Are Not Entitled to Qualified Immunity on Mr. Massimino's Seizure Claim.

Because Defendants cannot point to a particularized and objective basis for suspecting that Mr. Massimino was engaged in criminal activity, they are not entitled to qualified immunity. "Since *Terry*, it has been clearly established that when an officer can point to *no* facts at all to justify a hunch, the detention violates the Fourth Amendment." *Vasquez v. Maloney*, 990 F.3d 232, 240 (2d Cir. 2021) (emphasis in original).

In *Vasquez*, the Second Circuit affirmed the lower court finding of no qualified immunity given that "an officer's unconfirmed hunch that an arrest warrant might possibly exist, coupled with nothing more than the officer's recognition of a suspect from prior arrests, does not constitute reasonable suspicion." *Id.* at 243. Indeed, courts in this circuit agree that, notwithstanding that police may encounter different sets of facts at different times, reasonable articulable suspicion is the prerequisite for any

seizure, and unconfirmed hunches do not meet that requirement. *See, e.g.*, *Dancy*, 843 F.3d at 110 (affirming, at Rule 50 stage, district court's denial of qualified immunity where defendant "had no basis to suspect [the plaintiff] of legal wrongdoing"); *Hartline v. Gallo*, 546 F.3d 95, 103 (2d Cir. 2008) (vacating summary judgment on the issue of qualified immunity "in the absence of indicia that this Court has found to support individualized reasonable suspicion in the past"); *Sarnicola v. Westchester County*, 229 F. Supp. 2d 259, 275 (S.D.N.Y. 2002) (similar on summary judgment); *Tisdale v. Hartley*, 442 F. Supp. 3d 569, 575 (W.D.N.Y. 2020) (similar on motion to dismiss). *Accord Chestnut v. Wallace*, 947 F.3d 1085, 1092 (8th Cir. 2020) (affirming denial of qualified immunity on summary judgment because a "vague, conclusory statement that a person is suspicious is insufficiently specific to support his detention by the police, and merely observing police officers at work cannot give rise to a reasonable inference that criminal mischief is afoot," and further finding that police officers' allusions to attacks on police in the same location months earlier did not "tip the balance" in their favor).

Invoking qualified immunity on Mr. Massimino's Fourth Amendment seizure claim would twist a qualified immunity into an absolute one. Were Defendants' argument to prevail, any police employee could evade liability under Section 1983 for an unreasonable seizure by simply making up a wild suspicion about what a person might be doing, and then announcing that the Second Circuit had never opined on the application of the facts at hand to that far-fetched offense. "[E]ven though Fourth Amendment case law is often highly-fact specific, that does not mean it produces no clearly established law.*" Cotto v. City of Middletown*, 158 F. Supp. 3d 67, 85 (D. Conn. 2016) (denying qualified immunity in Fourth Amendment case); *see also Hope v. Pelzer*, 536 U.S. 730,741 (2002) ("[O]fficials can still be on notice that their conduct

violates [clearly] established law even in novel factual circumstances."). Where, as demonstrated above, Defendants' detention of Mr. Massimino relies entirely on an "inchoate and unparticularized suspicion or hunch" that cannot satisfy *Terry*, they do not get the benefit of qualified immunity.

### III.    Defendants Are Not Entitled to Judgment on Mr. Massimino's Fourth Amendment Malicious Prosecution Claim (Count Three).

Defendants make three arguments regarding Mr. Massimino's malicious prosecution claim. First, they argue that he is collaterally estopped from arguing that Defendants did not have probable cause to arrest him. Second, they argue that he must show proof of malice. And third, they argue that they had probable cause to arrest. As shown below, all three are unpersuasive.[10]

### A.  Mr. Massimino Is Not Collaterally Estopped from Pursuing His Malicious Prosecution Claim.

Defendants first argue that Mr. Massimino is precluded from establishing lack of probable cause for his arrest due to a pretrial motion in criminal court. That is wrong.

"[A] federal court must give to a state-court judgment the same preclusive effect as would be given the judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); *see also*

---

[10] It is not clear whether Defendants also argue that they are entitled to qualified immunity on this claim; in the relevant section of their brief, they use the term "Fourth Amendment" generically but focus on qualified immunity for the seizure. *See* Defs.' Mot. pp. 28-36. To the extent they do, it is plainly wrong given the clear absence of probable cause to arrest. "The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991); *see also Jennings v. City of Bridgeport*, No. 3:16-cv-117, 2018 WL 950115, at *11 (D. Conn. Feb. 20, 2018) (no qualified immunity because, on plaintiffs' version of facts, they were arrested without probable cause, and arrest without probable cause violated clearly established right).

28 U.S.C. § 1738; *Tanasi v. CitiMortgage, Inc.*, 257 F. Supp. 3d 232, 255 (D. Conn. 2017). Because the prior judgment alleged to have preclusive effect in this cause is a ruling by a Connecticut state court, it is Connecticut law that controls here.

Under Connecticut law, Mr. Massimino is not estopped from pursuing a malicious prosecution charge. The elements of issue preclusion under Connecticut law require that the issue (1) "must have been fully and fairly litigated in the first action" and (2) "must have been actually decided and the decision must have been necessary to the judgment." *Mulligan v. Rioux*, 643 A.2d 1226, 1244 (Conn. 1994) (quoting *Aetna Cas. & Sur. Co. v. Jones*, 296 A.2d 414, 425 (Conn. 1991)). The first prong here is key: Connecticut courts have held that "if the nature of the hearing carries procedural limitations that would not be present at a later hearing, the party might not have a full and fair opportunity to litigate." *Mulligan*, 643 A.2d at 1244 (explaining that fairness is a "crowning consideration" in determining collateral estoppel). In addition, "unless the unsuccessful party in the prior litigation had the opportunity to seek appellate review, that issue has not been 'fully litigated' for the purposes of collateral estoppel." *Weiss v. Weiss*, 998 A.2d 766, 782 n.20 (Conn. 2010) (citing *Comm'r of Motor Vehicles v. DeMilo & Co.*, 659 A.2d 148, 157 (Conn. 1995)); *see also Johnson v. Watkins*, 101 F.3d 792, 795 (2d Cir. 1996) (same, under New York collateral estoppel law).

A malicious prosecution plaintiff who loses a pretrial motion but is eventually acquitted or has the charges dismissed lacks the full and fair opportunity to continue disputing the probable cause issue, because they have zero interest in contesting the successful outcome of their criminal case. *Daniel v. Orlando*, No. 16-cv-1418, 2019 WL 1791517, at *4 (E.D.N.Y. Apr. 24, 2019) (collecting cases). Such is the case for Mr. Massimino. Because the state court ruling in his criminal case was preliminary, Mr.

Massimino could not appeal the finding until the close of the proceedings. *State v. Fielding*, 296 A.2d 96, 105 (Conn. 2010). But an opportunity for appeal never materialized. Mr. Massimino moved for a dismissal of all charges against him, which the judge granted, foreclosing the possibility of appeal on the probable cause finding. Even if Mr. Massimino, as a winning party, were *able* to appeal the preliminary finding of probable cause, he would have lacked incentive because if he won, he could have been exposed to a retrial on remand. Thus, Defendants' argument for collateral estoppel fails on *Mulligan's* first prong.

Defendants' citation of *Burton v. Undercover Officer* does not help their argument. Defs.' Mot. p. 18. The plaintiff in *Burton* was issue precluded because he had in fact previously litigated and lost the issue of probable cause in a separate § 1983 lawsuit in federal district court. *Burton v. Undercover Officer*, 671 F. App'x 4, 5 (2d Cir. 2016) ("In a prior lawsuit, Burton litigated whether there was probable cause for his March 2011 arrest.") (citing *Sherwyn Toppin Mktg. Consultants, Inc. v. City of New York*, No. 08-cv-1340, 2013 WL 685382, at *8 (E.D.N.Y. Feb. 25, 2013)). In this case, however, Mr. Massimino brings a civil suit for the first time. Contrary to Defendants' argument, pre-trial practice in state court criminal proceedings does not affect litigation of probable cause in subsequent civil actions in federal district court. *Marchand v. Simonson*, 16 F. Supp. 3d 97, 110 (D. Conn. 2014) (holding that "the Connecticut state criminal court's determination of probable cause during a probable cause hearing does not preclude relitigation of the issue of probable cause for the arrest in plaintiff's § 1983 civil case"). As the *Marchand* court reasoned, there are "procedural limitations inherent to the state court's probable cause hearing that do not apply in a civil trial." *Id*. The same is true for a state court preliminary motion to dismiss criminal charges.

*Marchand* and *Mulligan* are dispositive of the issue at hand. Mr. Massimino has not had a full and fair opportunity to litigate probable cause, *Mulligan*, 643 A.2d at 1244; *Marchand,* 16 F. Supp. 3d at 110, and is not precluded from pursuing a malicious prosecution claim here.

**B. Mr. Massimino Does Not Need to Separately Show Proof of Malice.**

The court should also reject Defendants' throwaway argument about proof of malice. Defs.' Mot. p. 25. As explained *supra*, Mr. Massimino succeeds on his malicious prosecution claim if he establishes a Fourth Amendment seizure along with the elements of a malicious prosecution claim under state law. *E.g.*, *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010). In Connecticut, there are four: the defendants (1) "initiated or procured the institution of criminal proceedings against the plaintiff" (2) terminating in the plaintiff's favor (3) without probable cause and (4) with malice. *E.g.*, *Brooks v. Sweeney*, 9 A.3d 347, 357 (Conn. 2010).

Connecticut law takes lack of probable cause as conclusively establishing malice: "If the evidence supports the former, we need not consider the latter, since it may be inferred." *Zenik v. O'Brien*, 79 A.2d 769, 772 (Conn. 1951); *see also Mulligan*, 643 A.2d at 1242 (same). From 1951 through the present, Connecticut courts have consistently maintained that a plaintiff need not allege a separate set of facts to satisfy the showing of malice, but rather that "malice may be inferred from lack of probable cause." *Falls Church Group, Ltd. v. Tyler, Coopers and Alcorn, LLP,* 912 A.2d 1019, 1027 (Conn. 2007); *see also Torlai v. LaChance,* No. 3:14-cv-185, 2015 WL 9047785 at *6 (D. Conn. Dec. 15, 2015) ("Connecticut courts have also made clear that . . . malice may be inferred from lack of probable cause.").

Defendants cite two cases, both of which involve New York malicious prosecution law. Defs.' Mot. p. 25. New York law is irrelevant. And Defendants mis-cite the cases anyhow; it is not correct that "[m]alice and probable cause usually compete with each other," even under New York law. *Manganiello*, 612 F.3d at 163 (explaining, in case involving New York law, that "lack of probable cause generally creates an inference of malice") (internal citations omitted).[11]

### C. Without Reasonable Articulable Suspicion to Detain Him, Defendants Could Not Force Mr. Massimino to Identify Himself, Nor Arrest Him for Failing to Do So.

Defendants concede that (1) the only criminal offense for which they assert they had probable cause was interference, Conn. Gen. Stat. § 53a-167a, Opp'n Stmt. ¶ 108, and (2) their purported probable cause for that offense was the fact that Mr. Massimino declined to identify himself. *Id.* ¶ 82. Given these undisputed facts, Defendants did not, as a matter of law, have probable cause to arrest Mr. Massimino.

As the U.S. Supreme Court has held, without reasonable articulable suspicion, the *Terry* stop was not justified, and Mr. Massimino was legally free to do as he pleased. He did not have to continue his conversation with Defendants. And he was certainly not bound to hand over his identification—nor punishable for failing to do so. "[E]ven assuming that [crime prevention] is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it." *Brown*,

---

[11] *Sulkowska v. City of New York*, 129 F. Supp. 274 (S.D.N.Y. 2001), involves New York law and runs counter to the prevailing view among district courts. Regardless, it held that the plaintiff's prosecution was "so totally lacking" as to justify an inference of malice anyway, and even an award of punitive damages. 129 F. Supp. 2d at 296.

443 U.S. at 52. Absent reasonable suspicion—and thus a valid *Terry* stop—Mr. Massimino was under no compulsion to engage in *any* conversation at all with the police, let alone identify himself. *Id.*

That is exactly what the Connecticut Supreme Court recognized when it expressly limited application of the interference statute at issue here[12] in accordance with *Brown*. *State v. Aloi*, 911 A.2d 1086, 1097 n.22 (Conn. 2007). The court was unequivocal in holding that while refusal to provide identification to an officer "may" violate Conn. Gen. Stat. § 53a-167a, this was *only* "in connection with a legitimate *Terry* stop." *Id.* At each juncture, the court was careful to couch its holding in that fact. *See, e.g.*, *id.* at 1096 ("valid" stop); 1097 n. 22 ("lawful" stop; "legitimate" stop). Indeed, the lawful nature of the *Terry* stop in *Aloi* was never in question. *Id.* at 1091.

When it comes to Conn. Gen. Stat. § 53a-167a—as both federal and state law make clear—"an individual may not be prosecuted under the statute for the refusal to obey an *unlawful* order." *Marsh v. Town of E. Hartford*, No. 3:16-cv-928, 2017 WL 3038305, at *3 (D. Conn. July 18, 2017) (emphasis in original). Without reasonable articulable suspicion, there was no need for Mr. Massimino to identify himself, and thus no probable cause. *E.g.*, *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 188 (2004) (absent a valid *Terry* stop, "an officer may not arrest a suspect for failure to identify himself"); *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business."); *Bostick*, 501 U.S. at 434, 430 (holding

---

[12] Connecticut's interference statute is in fact analogous to Texas'. *Compare* Conn. Gen. Stat. § 53a-167a *with* Tex. Penal Code § 38.15(a) (forbidding a person from "otherwise interfer[ing] with a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law").

that a police request for identification "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature," and a declination to identify absent a *Terry* stop "without more, does not furnish the minimal level of objective justification needed for a detention or seizure"); *Brown*, 443 U.S. at 53 (reversing conviction for failure to identify "because the officers lacked any reasonable suspicion to believe appellant was engaged or had engaged in criminal conduct" and "[a]ccordingly, [he] may not be punished for refusing to identify himself"); *Freeman*, 735 F.3d at 102 (no need to stop and engage in conversation where "the police lacked reasonable suspicion," so the defendant "certainly had the right to ignore the officers and continue on his way"); *Muhammad*, 463 F.3d at 123 ("[A]n individual approached by an officer who has no reasonable suspicion of wrongdoing may ignore the officer and go about his business, and his refusal to cooperate may not form the basis for his detention.").

As a matter of both federal and state law, Defendants could never have had probable cause to believe that Mr. Massimino's decision to stay anonymous violated Conn. Gen. Stat. § 53a-167a. Both our national and state supreme courts had instructed them to the contrary years earlier. To the extent Defendants assert qualified immunity, this dooms their argument.

Finally, as with Defendants' seizure argument, it is irrelevant whether or not Mr. Massimino's responses to their questions "heightened" Defendants' suspicions. Defendants cannot press rewind and justify their suspicion-less seizure of Mr. Massimino, and eventual arrest of him, based on what came afterward.

Because Defendants lacked reasonable articulable suspicion for the *Terry* stop, they could never have developed probable cause for Mr. Massimino's arrest. Accordingly, the Court should deny Defendants' motion as to Count Three.

**IV.    Conclusion**

This Court should deny Defendants' motion for summary judgment. Defendants do not contest Mr. Massimino's First Amendment claim, and they are not entitled to qualified immunity. Meanwhile, Defendants' Fourth Amendment argument depends on the assertion that an inchoate hunch, standing alone, enables them to detain, and subsequently arrest, anyone while evading liability. That directly contravenes canonical Fourth Amendment law, and certainly does not get them qualified immunity.

Defendants' arguments cannot stand. For the reasons described above, their motion for summary judgment should be denied.

Respectfully submitted,

\_\_\_/s/ Elana Bildner\_\_\_
Dan Barrett (# 29816)
Elana Bildner (# 30379)
ACLU Foundation of Connecticut
765 Asylum Avenue
Hartford, CT 06105
(860) 471-8475
e-filings@acluct.org

*Counsel for Keith Massimino*